*In re* MARRIAGE OF TERI EILEEN BREITENFELDT, Petitioner-Appellant, and RICHARD ALLEN BREITENFELDT, Respondent-Appellee.

Fourth District   No. 4—04—0987

Opinion filed November 30, 2005.

McCULLOUGH, J., dissenting.

Thomas P. Sweeney, of Tolono, for appellant.

Peter T. Borich, of Beckett & Webber, P.C., of Urbana, for appellee.

JUSTICE MYERSCOUGH delivered the opinion of the court:

Petitioner, Teri Eileen Breitenfeldt, appeals the trial court's denial of her petition to modify respondent, Richard Allen Breitenfeldt's, child support obligations to the parties' two children. We vacate the trial court's order and remand with directions to modify respondent's child support obligations.

## I. BACKGROUND

The parties were married in May 1992 and have two children together, Cody (born November 18, 1992) and Kaitlyn (born March 11, 1995). On October 6, 1995, petitioner filed a petition for dissolution of marriage pursuant to the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 through 802 (West 1994)). On December 15, 1995, the trial court entered a judgment of dissolution of marriage and approved the parties' marital settlement agreement and joint-parenting agreement. The marital settlement agreement provided, *inter alia*, that the parties would have joint custody of Cody and Kaitlyn and respondent would pay petitioner $350 per month for child support. The marital settlement agreement further provided:

> "Husband, on or before April 15th of each year shall furnish Wife a copy of all W-2 forms or other evidence of his income for the prior year. Should an increase in child support then being paid be authorized said increase shall be retroactive to January 1st of that year. Wife, if requested by Husband, shall promptly furnish him copies of her W-2 forms for the prior year."

On December 10, 1996, the parties agreed by stipulated order to void the joint-parenting agreement and give petitioner sole custody of the children. On May 13, 1997, petitioner filed a petition to increase child support, alleging respondent had received salary increases and that he should be required to pay half of the children's schooling expenses. The record reflects entry of an order for withholding on August 18, 1997, indicating $80.77 per week to be withheld immediately from respondent's employer.

On August 19, 2002, the Illinois Department of Public Aid (IDPA) intervened as the provider of payments to the children and requested redirection to itself of any child support payments made in the case. IDPA also filed a notice to withhold respondent's income in the amount of $350 per month and a petition for modification of child support. On June 12, 2003, the court entered a uniform order for support, modifying the amount respondent was required to pay to $488.50 per month retroactive to January 1, 2002.

On March 31, 2004, petitioner filed a petition for modification, alleging that, since entry of the last modification, a substantial change in circumstances had occurred in that (1) respondent's total income for 2003, computed in accordance with section 505 of the Act (750 ILCS 5/505 (West 2004)), reflects an average monthly income of between $3,000 and $3,500 for the year; (2) petitioner's costs to provide for the children continue to increase as they grow older; (3) the children require orthodontia at an estimated cost of $5,000 each; (4) petitioner's financial resources had been reduced as a result of her January 2004 divorce; (5) respondent had been relieved of most or all of his other debts as a result of filing bankruptcy; and (6) statutory standards for the minimum contributions toward the support of two children have increased.

On July, 6, 2004, the trial court held a hearing on the petition. At the hearing, petitioner called Heather Keigher, a payroll processor for respondent's employer, to testify as to University Auto Park's payroll system. Keigher testified sales associates such as respondent are paid in three different ways: (1) "draw," (2) SPIFF (which the record does not define), and (3) commission. A draw, paid twice per month in the amount of $1,000, is essentially a salary but functions as an advance on commissions, since sales representatives are paid on a 100% commission basis. Therefore, respondent repays his draw to University Auto Park from his monthly commission.

Respondent's payroll records also show income from sales SPIFFs, finance and insurance SPIFFs (F&I), and deductions for SPIFF advances. Keigher testified sales SPIFFs are akin to bonuses to reward employees for selling a vehicle. An F&I SPIFF is a similar reward

from the dealership's finance and insurance department. An employee who receives any kind of SPIFF can present it for immediate payment or have it put on his or her paycheck for that period. Either way, the SPIFF shows up on the payroll for that pay period as income, and the employee is taxed for the amount of the SPIFF. If the employee has already cashed the SPIFF, it is then deducted from the gross income for that period.

The third way respondent is paid is by commission. On cross-examination, Keigher explained the relationship between draw and commission as follows:

"A. The draw amount—okay. The way I understand it, um, you've got your—the 26 weeks of draw money, but when it comes to when you have your commissions that are once a month, that draw money is even deducted from that. *** [I]f they had a commission of 5000 and they had already gotten 1300 in their draw, they've already gotten that money, that's deducted off of that and then they get their commission amount. And then, of course, that's taxed.

Q. MR. BORICH [(respondent's attorney)]: But, again, that's all taxable?

A. Yes. Everything—

Q. Even though there's a deduction, that's all taxable?

A. Everything is taxable, yes.

Q. So, the draw amount and then the commission amount, um, even though they're all taxable, that's not an accurate reflection of actual income that the sales associate would receive? It's not an accurate—it's not accurate of what the sales associate would pocket in terms of money because you both have the draw that's taxable and the commission that's taxable, but then there is a deduction because you subtract one from the other?

A. Exactly.
***

Q. So, on a W-2 form, if with regard to the income that's listed as taxable income, that would include both draw money and commission money?

A. Everything. Yes."

To clarify the relationship between draw, SPIFFs, and commission, the trial court engaged in the following colloquy with Keigher:

"THE COURT: *** Okay. I'm just trying to figure out how this draw works in. So, we need to give you a better example. He has $26,000 in draw, and $25,000 in SPIFF's—

THE WITNESS: Which is pretty high, but okay.

THE COURT: Okay. Just work with me here.

THE WITNESS: I know.

THE COURT: And $25,000 in commissions.

THE WITNESS: Okay.

THE COURT: So I'm guessing, then, that his taxable income is going to be 25 plus 25, which is 50, minus the 26; is that right?

THE WITNESS: Yes.

THE COURT: Because he's got to pay you back for the draw—

THE WITNESS: He's paying us back, yes. Exactly.

THE COURT: And if his SPIFF's and his commissions are 10,000 and 10,000 for a total of 20, then his taxable income is still going to be 26, he just owes you guys 6—

THE WITNESS: He actually—

THE COURT: —six grand.

THE WITNESS: Yes. Yes.

THE COURT: But he's gotten that 26,000 in his pocket that he can spend, he just kind of owes you?

THE WITNESS: Yes."

Additionally, Keigher testified that if a salesclerk drives one of O'Brien's vehicles, his pay stub reflects a $50-per-month "demo allowance," which is reported as taxable income; but there is also a $90 demo allowance deduction. Therefore, she opined that employees still paid "something" for use of the car. Keigher also explained the accounts receivable deduction on respondent's pay stub. She testified it is generally for car repair and is deducted from the employee's paycheck. Keigher also testified that all benefits at respondent's employer fall under the "cafeteria plan," meaning that when reporting income to the Internal Revenue Service, benefits are subtracted out and not included in gross income.

Petitioner testified that, as a result of her January 2004 divorce, she incurred additional costs for her children of $100 per month for babysitters and $200 per month for daycare, even with the daycare costs partially subsidized by the government. Petitioner had been on her husband's insurance prior to the divorce, and she now had to pay for her own medical care. She does not currently have medical coverage because she cannot afford it. On her income affidavit, petitioner claimed $200 per month in medical care. On cross-examination, however, she admitted this figure was probably overstated. Additionally, petitioner had to pay all of the rent herself ($700 per month) and part of the food and utilities ($510 per month). Petitioner also testified that both children were going to need braces in the future, which will cost $5,000 each. Petitioner testified she works at Montessori School, where she takes home around $1,200 per month when she works full-time during the winter and half of that during the summer. Petitioner's expense affidavit showed a net monthly income of $1,568.50 and

monthly expenses of $3,191.66, meaning petitioner's monthly expenses exceeded her monthly income by $1,623.16.

Respondent testified as an adverse witness (see 735 ILCS 5/2— 1102 (West 2004)). He acknowledged petitioner's exhibit No. 8 to be his and his wife's tax return for 2003. The three minor dependents listed on the return include one child, Cody Breitenfeldt, from his marriage to petitioner. He identified an income item of $1,000, listed as "Other Income from Form 1099-Miscellaneous," as a SPIFF he had earned from a source other than University Auto Park. Respondent acknowledged that he filed bankruptcy in October or November 2003. Respondent's employer provides him a car to take home at night "for dealership use, to go home and back and within limited range of the dealership or on dealership business."

Following arguments by the parties, the trial court first reviewed its calculations in previously setting support at $488.50 per month and noted that that figure looked reasonable. The court continued:

"I then have to address the primary issue before the court: Has there been a substantial change in circumstances? Um, looking at the figures that I have here, it's pretty clear that his income is pretty similar to what it was a year ago [when the court found respondent's net monthly income to be $1,954]. So, I'm going to deny the Petition to Modify finding—there is—there is somewhat of a change in circumstances. I've heard testimony today that the [petitioner] has been divorced, and that affects her available resources primarily, I think, because of the impact on childcare costs and obviously there's only one income available for fixed costs. But, on the other hand, there's one less adult who must be supported, as well. That's really the only notable change in circumstances that I find that [sic] this time."

The court further ordered respondent to be responsible for half of any of the children's orthodontic expenses. Following a hearing, the court denied petitioner's motion to reconsider, and this appeal followed.

## II. ANALYSIS

### A. Petitioner's Income

■ On appeal, petitioner argues the trial court erred in denying her petition for modification of child support. Section 510(a) of the Act provides that a child support judgment can only be modified upon a showing of a substantial change in circumstances. 750 ILCS 5/510(a) (West 2004). When determining whether sufficient cause to modify has been shown, courts consider both the circumstances of the parents and the children. *Fedun v. Kuczek*, 155 Ill. App. 3d 798, 801, 508 N.E.2d 531, 533 (1987). The increase in the child's needs must be bal-

anced against the relative ability of the parents to provide for them, and where a change has occurred that creates a substantial imbalance between the child's needs and the parent's support capabilities, modification is required. *Fedun*, 155 Ill. App. 3d at 801, 508 N.E.2d at 533. Trial courts have wide latitude in considering whether a substantial change has occurred warranting modification and should consider not only the needs of the children and the financial status of the noncustodial parent, but also the needs and financial status of the custodial parent, the financial resources of the children, the standard of living the children would have enjoyed had the marriage continued, and the physical, emotional, and educational needs of the children. *In re Marriage of Riegel*, 242 Ill. App. 3d 496, 498-99, 611 N.E.2d 21, 23 (1993). The trial court's determination of whether a substantial change in circumstances has occurred is one of fact and will not be disturbed unless against the manifest weight of the evidence. *In re Marriage of Armstrong*, 346 Ill. App. 3d 818, 821, 805 N.E.2d 743, 745 (2004).

We find the trial court abused its discretion in finding no substantial change of circumstances in light of changes in petitioner's income. Petitioner's testimony was that she had been recently divorced and, as a result, her expenses had increased. Importantly, she now has only one income with which to support the children. Moreover, petitioner now has additional costs of $300 per month in childcare she did not have before the divorce, and she now has no medical insurance and has to pay for her own medical care. The court noted the change in petitioner's available resources resulting from her divorce but apparently found it to be balanced out by the fact there was also one less adult to feed. Specifically, in denying the petition for modification, the court stated:

> "I've heard testimony today that the [petitioner] has been divorced, and that affects her available resources primarily, I think, because of the impact on childcare costs and obviously there's only one income available for fixed costs. But, on the other hand, there's one less adult who must be supported, as well. That's really the only notable change in circumstances that I find that this time."

We find no evidence in the record supporting this conclusion. Petitioner still has the same expenses: food, clothing, and transportation costs. Rent and utilities costs no doubt doubled. When child support is $488.50 per month, the $300 increase in childcare alone reflects a huge drain on petitioner's assets. Clearly, petitioner's divorce constituted a substantial change in circumstances warranting modification.

### B. Respondent's Income

Petitioner also argues the court incorrectly determined respon-

dent's net income consistent with section 505 of the Act. We agree. The starting point for determining a child support award is to determine the noncustodial parent's net income. 750 ILCS 5/505 (West 2004); *In re Marriage of Baylor*, 324 Ill. App. 3d 213, 216, 753 N.E.2d 1264, 1266 (2001). The findings of the trial court as to net income and the award of child support are within its sound discretion and will not be disturbed on appeal absent an abuse of discretion. *In re Marriage of Freesen*, 275 Ill. App. 3d 97, 103, 655 N.E.2d 1144, 1148 (1995).

The confusion in this case centers on the interplay between respondent's draw, SPIFFs, and commissions. This confusion was exacerbated by respondent's attorney and Keigher's confusing and, at times, seemingly inaccurate testimony. We sympathize with the trial court given our difficulty understanding the evidence in this case.

Petitioner argues that respondent's draw is included in his taxable income, while respondent claims that his W-2 forms, payroll stubs, and tax return misrepresent his actual income because these documents fail to reflect repayment of his draw from his commission proceeds. Respondent claims and the trial court apparently agreed that his W-2, payroll documents, and tax return overstate his income by failing to account for repayment of his draw from his commission proceeds. We disagree.

According to the testimony, respondent is paid in three ways: (1) draw, (2) SPIFFs, and (3) commission. He receives a check every two weeks that includes his draw of $1,000 and reflects SPIFFs he received during the pay period. The SPIFFs may be cashed when received, in which case they are added to respondent's gross income for the pay period for tax purposes and then deducted because they have already been paid; otherwise they are simply added to the draw. Additionally, respondent is compensated each month for the commission he earned during the preceding month.

For example, University Auto Park's payroll records for May 2004 show he was paid $1,000 in draw twice during that period. He also received SPIFFs of $730 during the first half of May and $550 during the second half. Including these SPIFFs and demo allowance (which is income from respondent's use of one of University Auto Park's cars), respondent's gross income for the two checks was $1,680 for the first half of May and $1,600 for the second half. One reason respondent's income appears low as reflected on his bimonthly checks is because he cashed the SPIFFs when he received them as opposed to having them added to his check. When an employee cashes a SPIFF instead of having it put on his paycheck, the amount of the SPIFF is added to the gross income for the pay period to ensure it is taxed as income but is then deducted before issuance of the check. Accordingly, while the

checks actually issued total only $528.76 for the month, respondent actually earned an additional $1,280 gross in SPIFFs.

Moreover, during April 2004, respondent had a gross income from his sales commissions of $4,273.54. Respondent would claim $2,000 less than this amount actually went into his pocket because his monthly draw is subtracted from his commission. According to respondent, while University Auto Park issued him a check for $2,750.01 for his commission (after taxes), he only made $750.01 after subtraction of his draw. In fact, if this were true, every commission check should be $2,000 less than it was. This makes no sense. We instead find that respondent's commission checks reflect that which respondent earned in commission over and above his $2,000 draw for the previous month. In other words, respondent actually earned $6,273.54 in commission, and University Auto Park only issues him a check when his commission exceeds his draw for the previous month. The months in which respondent was not issued a commission check do not necessarily represent months in which he earned no commission but rather months where his commission was less than his draw.

According to petitioner's exhibit No. 1-A, which respondent admitted to the accuracy of, in 2003, respondent earned $26,000 in draw, $17,986.22 in commission, $6,575 in SPIFFs, and $1,200 in demo allowance, resulting in a gross income from these sources of $51,761.22. This figure is similar to the gross income of $50,964.30 reported on respondent's W-2 and tax return. Additionally, respondent's earnings for the first part of 2004 are similar to 2003. In the first four months of 2004, respondent earned $8,000 in draw, SPIFFs of $2,090, and commission of $4,956.66. Averaged out over the rest of 2004, this would put respondent's gross income again around $50,000.

It defies logic that University Auto Park, on its W-2, and respondent, on his tax return, would list as income money respondent never received or from which he never derived any benefit. If respondent never actually received a benefit, it is not income. See *In re Marriage of Rogers*, 213 Ill. 2d 129, 136-37, 820 N.E.2d 386, 390 (2004), quoting Webster's Third New International Dictionary 1143 (1986) (" 'income' is simply 'something that comes in as an increment or addition ***: a gain or recurrent benefit that is us[ually] measured in money ***: the value of goods and services received by an individual in a given period of time' "). Neither does the record reflect any amended income-tax returns correcting this alleged overpayment.

Moreover, Keigher's testimony, while admittedly confusing, does not contradict the view that respondent's income includes draw and commission paid, as evidenced by the following colloquy:

"A. The draw amount—okay. The way I understand it, um, you've

got your—the 26 weeks of draw money, but when it comes to when you have your commissions that are once a month, that draw money is even deducted from that. *** [I]f they had a commission of 5000 and they had already gotten 1300 in their draw, they've already gotten that money, that's deducted off of that and then they get their commission amount. And then, of course, that's taxed.

Q. MR. BORICH [(respondent's attorney)]: But, again, that's all taxable?

A. Yes. Everything—

Q. Even though there's a deduction, that's all taxable?

A. Everything is taxable, yes.

Q. So, the draw amount and then the commission amount, um, even though they're all taxable, that's not an accurate reflection of actual income that the sales associate would receive? It's not an accurate—it's not accurate of what the sales associate would pocket it terms of money because have both the draw that's taxable and the commission that's taxable, but then there is a deduction because you subtract one from the other?

A. Exactly.
***

Q. So, on a W-2 form, if with regard to the income that's listed as taxable income, that would include both draw money and commission money?

A. Everything. Yes."

## C. Section 505(a) Income

While the trial court did not make any calculations on the record, it stated that it found respondent's current income to be similar to what it had found in May 2003. We disagree. Section 505 of the Act requires the court to set the minimum amount of child support for two children at 28% of the noncustodial parent's net income, unless the court finds reason to deviate from this figure. 750 ILCS 5/505(a)(1), (a)(2) (West 2004). Section 505(a)(3) defines "net income" as the total of all income from all sources minus the following deductions: (1) federal income tax, (2) state income tax, (3) social security withholdings, (4) mandatory retirement contributions, (5) union dues, (6) dependent and individual health insurance premiums, (7) prior obligations of support or maintenance, and (8) expenditures for repayment of debts that represent reasonable and necessary expenses for the production of income. 750 ILCS 5/505(a)(3) (West 2004).

Respondent's tax return and W-2 for 2003 show a total income of $50,964.30, which after adding $4,633.73 in benefits from the cafeteria plan, puts respondent's total income for 2003 at $55,598.03. Section

505(a)(3) of the Act allows the following deductions to arrive at respondent's net income:

| | |
|---|---|
| Federal income tax: | $4,781.24 |
| State income tax: | $1,529.06 |
| Social Security Payments: | $3,159.79 |
| Medicare Withholding: | $738.98 |
| Health insurance premiums: | $295.50 |
| Family Health Insurance Premiums: | $3,712.50 |
| Dental Insurance Premiums: | $625.73 |
| O'Brien Uniforms: | $80.63 |
| Total | $14,923.43 |

Additionally, as petitioner points out, in 2003, respondent overwithheld federal and state taxes, resulting in a refund of $3,545 from federal taxes and $312 from state taxes, and this amount is added back into respondent's net income. *In re Marriage of Pylawka*, 277 Ill. App. 3d 728, 733, 661 N.E.2d 505, 509 (1996) (if the noncustodial parent overwithholds on his W-2, the amount should be added back to his net income when determining his child support under section 505(a) of the Act). We further note that the record reflects no amended tax return to account for any overpayment. Therefore, according to our calculations, respondent's net income under section 505 of the Act is $55,598.03—$14,923.43 + $3,857 = $44,531.60. Dividing this figure by 12 results in a monthly net income of $3,710.97. We note that the minimum amount of support for two children was increased from 25% to 28% subsequent to the 2003 order. See Pub. Act 93—148, § 5, eff. July 10, 2003 (2003 Ill. Laws 1628, 1628). Therefore, 28% of $3,763.71 results in a monthly child support obligation of $1,039.07.

Respondent's total income for the first four months of 2004 is $17,470.18. After adding in $1,544.38, representing one-third of respondent's yearly benefits from the cafeteria plan, this total is $19,014.56. For the first four months of 2004, respondent's deductions are as follows:

| | |
|---|---|
| Federal income tax: | $1,261.00 |
| State income tax: | $466.15 |
| Social Security Payments: | $963.30 |
| Medicare Withholding: | $225.29 |
| Family Health Insurance Premiums: | $1,685.00 |
| Dental Insurance Premiums: | $218.44 |
| Total | $4,819.18 |

While we are unsure of respondent's tax status for 2004, his net income under section 505 of the Act for January through April 2004 is $19,014.56—$4,819.18 = $14,195.38. Multiplying this number by three results in a net income for the year of $42,586.14. Dividing this figure by 12 yields a monthly net income of $3,548.85. Therefore, 28% of $3,548.85 results in a monthly child support obligation of $993.68. We note that his figure does not include any tax refund, while the 2003 figure does.

In May 2003, the trial court found respondent's net income pursuant to the Act to be $1,954 per month for the first 130 days of 2003 and set child support at $488.50 per month, representing 25% of the monthly income. Such a finding puts respondent's yearly net income for 2003 in the neighborhood of $23,500. With respect to the instant petition, in finding respondent's income was similar to what the court had previously found it to be, the court did not explain how it arrived at the figure. Keigher's testimony as well as respondent's W-2 and tax return indicate that respondent's net income is now substantially higher. We find this increase in respondent's income also constitutes a substantial change in circumstances.

■ Therefore, we vacate the trial court's order denying the petition for modification and remand for the court to modify respondent's child support obligations in light of our findings. We are mindful that respondent's income is not static from month to month since he works on commission, and the court may consider this or any other relevant factors warranting deviation from the guidelines in setting the modified amount. See 750 ILCS 5/505(a)(2) (West 2004).

### III. CONCLUSION

For the reasons stated, we vacate the trial court's judgment and remand for further proceedings consistent with this order.

Vacated and remanded with directions.

COOK, P.J., concurs.

JUSTICE McCULLOUGH, dissenting:

I respectfully dissent and would affirm the trial court's order.

I disagree with the majority's mathematics and conclusions as to respondent's income. The testimony and exhibits concerning his income had to be a nightmare for the trial court. Heather Keigher, payroll processor for respondent's employer, was called as a witness by the petitioner. The cross-examination of Keigher and the trial court's colloquy with Keigher further justifies the trial court's decision.

The respondent's brief is correct in stating:

"Ms. Keigher, as a witness for Petitioner, made clear why Respondent's W-2 forms and pay stubs were not accurate reflections of Respondent's net income. Although all of Respondent's draw, SPIFFs, and commissions appear on his W-2 forms and as income on his pay stubs, these documents fail to reflect the 'repayment' of Respondent's draw from his commission proceeds. Accordingly, that Respondent's W-2 forms reflect so-called taxable income of more than Fifty Thousand Dollars ($50,000.00) misrepresents Respondent's actual taxable income. In view of the Trial Court's grasp of the actual net income Respondent receives from his employer's convoluted payroll system, the Trial Court justifiably did not increase Respondent's child support obligation."

Our decision remands for a new hearing and a second bite at the apple by petitioner.