NO. 4-07-0256          Filed 4/3/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | |
|---|---|
| In re: the Marriage of | ) Appeal from |
| ROBERT J. DEIKE, | ) Circuit Court of |
|     Petitioner-Appellant, | ) McLean County |
|     and | ) No. 94D540 |
| MARSHELLA M. DEIKE, | ) |
|     Respondent-Appellee. | ) Honorable |
| | ) Rebecca Simmons Foley, |
| | ) Judge Presiding. |

_____

JUSTICE KNECHT delivered the opinion of the court:

Petitioner, Robert J. Deike, appeals from an order (1) requiring him to pay one-half of his three children's college expenses; (2) denying his request to reduce child support, except as to the requirement he maintain health insurance on the children; and (3) finding him in indirect civil contempt for failure to (a) pay one-half of the children's college expenses in a timely manner and (b) remain current with child-support obligations.  We affirm as modified.

I. BACKGROUND

Robert and respondent, Marshella M. Deike (now Goben), were married on October 17, 1981.  Three children were born of the marriage, Brennon, born July 7, 1984; Ashley, born March 19, 1986; and Paige, born August 6, 1987.  On October 19, 1994, the trial court entered a judgment for dissolution of marriage incorporating a marital settlement agreement.  The marital settlement agreement provided each party agreed to pay 50% of the children's college expenses; Robert agreed to pay Marshella

$312.50 in child support every two weeks; and each party agreed to keep the children covered under his or her employer-provided health-care plan.

At the time of the dissolution, Robert was employed by Diamondstar Motors (now Mitsubishi) and Marshella was employed at State Farm Insurance Companies. In January 2004, Mitsubishi decided to downsize and Robert's position was eliminated in February 2004. He received a severance package of 38 weeks worth of pay and health insurance. He also received unemployment insurance benefits until about October 2004.

The parties' oldest child, Brennon, began college at Augustana College in the fall of 2003. The parties' two daughters were in high school.

On June 18, 2004, Marshella filed a petition regarding educational expense asking the court to define the term "college expenses" in the provision of the marital settlement agreement requiring each party to pay 50% of the children's college expenses. That same date Marshella filed a petition for modification of child support asking Robert be required to contribute to the medical and dental insurance expenses for the children and for such other relief as deemed just by the trial court. Finally, also on June 18, 2004, Marshella filed a petition for a finding of indirect civil contempt for failure to pay child support because Robert was two weeks in arrears on his child-support payments.

On August 11, 2004, Marshella filed an amended petition

- 2 -

regarding educational expense in which she requested the trial court include reasonable contribution toward living expenses during the summer months be included in the definition of "college expenses" in the provision of the marital settlement agreement requiring each party to pay 50% of the children's college expenses. On September 30, 2004, Robert filed a petition to reduce child support to not only reduce his child-support amount but also to eliminate the requirement he maintain health insurance through his employer.

On October 13, 2006, Robert filed a petition to modify post-high-school financial support in relation to the provision of the marital settlement agreement requiring each party to pay 50% of the children's college expenses. On November 7, 2006, Marshella filed a second amended petition regarding educational expense as all three of the children were now in college and the term "college expenses" in the provision of the marital settlement agreement requiring each party to pay 50% of the children's college expenses still needed to be defined. That same day Marshella also filed an amended petition for adjudication of indirect civil contempt relating to Robert's willful failure to pay one-half of the children's college expenses.

On January 19, 2007, the trial court heard evidence concerning all pending petitions. At the time of the hearing, all three children were attending college. Brennon was a senior in his final semester at Augustana College; Ashley was a freshman at Lincoln College in Normal and was a commuter student, living

with Marshella; and Paige was a freshman at Augustana College, living on campus.

Testimony in regard to Brennon's college expenses was he received $12,671 per year in grants and scholarships and $1,350 per year in federal work study, which required him to work to receive that money. He also earned between $1,424 and $2,237 each summer while in college. Based on Marshella's exhibits, Robert still owed $9,856.12 through the first semester of Brennon's senior year.

Marshella testified at that time Robert owed her $2,931.92 as his share of college expenses for Ashley's first semester. A full-time commuter student at Lincoln College can expect to pay $15,810 in tuition and fees per academic year. Ashley is receiving a scholarship of $3,500 per year. Marshella presented exhibits from Lincoln College and Illinois State University (ISU) showing the out-of-pocket expenses for a full-time commuter student were $3,425 and $6,994, respectively. Marshella requested Ashley's living expenses for college be calculated at the $3,425 level. Ashley worked throughout high school and earned between $2,970 in 2003 and $7,358 in 2005. She now works one eight-hour day per week while in college.

As for Paige's expenses, Marshella testified Robert's 50% share of college expenses still owed through December 10, 2006, was $6,930.75. Paige works 8 to 10 hours weekly while at school and receives the same amount of financial assistance as Brennon, approximately $12,000 per school year. Marshella

asserted, without any documentation, the cost for Brennon and Paige to attend Augustana College, after deducting grants, scholarships, and work study is significantly less than it would have been to attend the University of Illinois and not receive any scholarships and grants.

Marshella also requested reimbursement of $577.97, one-half of the added expenses she incurred during 2 1/2 months of summer when the three children resided with her. She testified Robert was also $2,187.50 in arrears in his child-support obligations.

After the parties' divorce, Marshella set up savings accounts on behalf of the children to save for college expenses. She used these to pay for a portion of her 50% contribution to their expenses and depleted them completely during the girls' first semester in college.

At the time of the hearing, Marshella was earning approximately $57,000 per year at her job at State Farm. At the time of the dissolution, 14 years earlier, she made approximately $30,000 per year. Including the expenses she incurred for the children's college education, Marshella's average monthly expenses totaled $5,350.74, while her net monthly income from all sources was only $2,361.95.

Marshella testified when the girls decided to attend college, they did not discuss their college selections with Robert. Ashley decided to go to Lincoln because she received a $3,500 scholarship and she liked the school. She wanted to

attend Lincoln instead of Parkland College because she could use the facilities at ISU if she chose to transfer there.  Paige decided to attend Augustana because she liked the campus, her brother attends there, it asked her to run cross-country although it did not give athletic scholarships, and she would have opportunities there to do research in her chosen major, biology.

Robert had a college degree and educational experience in computer-aided drafting and pre-engineering courses.  He was a staff engineer when last employed at Mitsubishi and had previous employment experience as a contract draftsman as well as a maintenance mechanic and in project management.  In 2004, Robert reported net earnings of approximately $47,000.  Robert testified when he was laid off in 2004, he applied to 25 to 30 engineering firms in Central Illinois, Wisconsin, Minnesota, and North Dakota.

In late fall 2004, Robert and his current wife, Sue, purchased property in Ada, Minnesota, containing a bar and grill with a small apartment upstairs for $32,000.  They put $16,000 down on the property and at the time of the hearing in January 2007 the balance on the property was approximately $15,000.  Robert and Sue decided to become self-employed by operating the bar and grill when Robert was having trouble finding work in his field.  Robert previously lived in Minnesota and had family there.  Sue had previous experience working in the restaurant industry.  In addition to the mortgage, Robert testified he and Sue spent $5,922 and $11,087 for new equipment and remodeling

during the first year they owned the bar and grill.

Robert also owns a cabin on a lake in Minnesota which he inherited from his parents. In July 2006, when Robert obtained a $23,000 mortgage on the lake property, it appraised at $120,000. As of the hearing, Robert testified as an adverse witness the mortgage was then approximately $20,000. Robert also owns a 16-foot outboard motorboat worth $6,000 he uses at the cabin and two snowmobiles. Robert also owns property in LeRoy, Illinois, containing four commercial buildings. The property previously contained a gas station and was found to have soil contamination after his purchase. Although he at one time was asking $57,000 for the property, now he would simply like to get the value of the mortgage he still owes, $35,000, but he was having a hard time selling the property.

Robert testified the bar and grill lost $28,000 in 2005 and he anticipated a loss for 2006 but not as great a loss.

In January 2006, Robert took out a $10,000 parent loan to pay for some of Brennon's college tuition. The loan proceeds were sent directly to Augustana but since all $10,000 was not needed at that time, approximately $4,000 was refunded to Robert. The $4,000 returned to Robert was not used for college expenses. Robert still owed $9,000 on that loan.

Robert's wife Sue also testified. She and Robert bought the bar and grill because Robert was "pretty good with money" and she had worked in bars and restaurants all her life. When Robert and Sue purchased the bar and grill, they intended

for it to be their only employment; but in spring 2005, when he was putting child-support payments on credit cards, Sue insisted Robert find another job and he began working at Fargo Paint and Glass where he earns approximately $27,000 per year.

Sue does most of the work at the bar now, putting in 100-hour weeks, while Robert performs maintenance and sometimes tends bar, working 30 to 40 hours per week in addition to his job at Fargo Paint and Glass. The business is mostly a cash business and Sue and Robert receive no salaries. Any tips they receive go back into the coffers of the business. They pay $8,000 per year for dramshop insurance. Sue testified they spent $45,000 in 2005 to remodel their kitchen and another $10,000 in one-time start-up costs. Of the $45,000 spent for the kitchen, $30,000 came from a loan and they spent $15,000 out of pocket. The parties have an $80,000 debt-consolidation loan. The bar and grill lost money in 2005 and again in 2006, but not as much with $126,000 gross sales in 2006.

Robert testified in his own behalf and corrected his earlier testimony concerning the loan secured by the cabin. He stated the debt-consolidation loan, which was between $60,000 and $80,000, was secured by the mortgage on the cabin. He stated he was unsure of the amount in his earlier testimony.

After considering all of the evidence, the trial court granted Marshella's second amended petition regarding educational expenses. The court ordered Robert to share equally in college expenses for all three children, defined as tuition, fees, room,

board, books, personal expenses, and transportation expense; medical- and dental-insurance contribution; uninsured medical, dental, vision, orthodontia, and other health-related expenses not covered by medical and dental insurance; and to make reasonable contribution toward living expenses of the children during the summer months. Specifically, the court ordered Robert to pay one-half of Ashley's living expenses with two equal installments of $1,712.50 per academic year, thus making Robert's one-half equal to $3,425 per year and her total living expenses $6,850. This was double the amount actually requested by Marshella. As to the summer expenses, the court ordered Robert to pay $329.02 for the next two summers (2007 and 2008). The court excluded Marshella's requested reimbursement for costs for mortgage, property taxes, and insurance, as those are fixed costs regardless of the presence of the girls. The court found Robert owed $26,236.78 in past college expenses.

In denying Robert's petition to modify post-high-school financial support, the court found the parties' children contributed to their college education by obtaining financial assistance and working, thus significantly reducing college costs. Further, the court found the costs were "very reasonable" despite being private colleges. The court also stated at the time of dissolution Robert made "substantially greater income" than Marshella and continued to work at Mitsubishi for 10 more years. Yet Marshella saved money for the children's college education while Robert did not. The court found modifying the parties' agreement

now to make Marshella pay a greater share would be unfair. Although Robert no longer earns his Mitsubishi salary, he has assets to use as collateral for college loans.

The trial court granted Robert's petition to reduce child support in part and denied it in part. The court relieved Robert of the requirement he maintain health insurance on the children as of September 30, 2004, the date he filed his petition to modify. However, because Marshella is required to continue to maintain group medical, dental, and vision insurance on the children so long as they are dependents, the court found Robert is required to reimburse Marshella one-half of the monthly costs of that insurance, currently $67.51.

As for child support, the trial court denied Robert's request to decrease his child-support obligation. The court noted while he lost his employment at Mitsubishi through no fault of his own, once his unemployment benefits terminated, he purchased the bar and grill, which he and his spouse report has operated at a loss since the purchase. Not until spring 2005 did Robert seek full-time employment when he had depleted his savings account and began placing child support and college expenses on credit cards. As a result, the court found Robert owed $2,187.50 in child support.

Finally, the trial court found Robert in indirect civil contempt of court for failure to pay one-half of the children's college expenses in a timely manner and for his failure to remain current with child support. As a sanction for his contempt,

Robert was ordered to pay $2,382.67 as partial reimbursement for Marshella's attorney fees. The court found Robert was due a credit of $4,375 for amounts paid in either child support or college expenses after June 1, 2006, and, thus, the total amount Robert owed in past college expenses plus past child support was $24,049.78. He could purge his contempt by paying to Marshella that amount on or before April 15, 2007.

This appeal followed.

## II. ANALYSIS

### A. College Expenses

"A trial court's decision to award educational expenses will not be reversed absent an abuse of discretion." In re Marriage of Thomsen, 371 Ill. App. 3d 236, 243, 872 N.E.2d 1, 7 (2007). A trial court has the authority to modify provisions of a marital settlement agreement pertaining to payment of college expenses. In re Marriage of Loffredi, 232 Ill. App. 3d 709, 712, 597 N.E.2d 907, 910 (1992). "The pertinent question in determining whether to grant a petition for modification of a provision for payment of college expenses is the same as that on a petition to modify any other support term. That is, whether the petitioner has shown a substantial change in circumstances [citation.]" Loffredi, 232 Ill. App. 3d at 714, 597 N.E.2d at 911.

As with any other form of child support, a trial court can consider the parties' assets and other elements of financial resources, even the financial status of a current spouse, to determine whether payment of support would endanger the ability

- 11 -

of the support-paying party and that party's current spouse to meet their needs.  In re Marriage of Keown, 225 Ill. App. 3d 808, 813, 587 N.E.2d 644, 647 (1992).  When courts look at a parent's ability to pay a child's educational expenses, their financial resources include all money or property to which the parent has access.  In re Marriage of Drysch, 314 Ill. App. 3d 640, 644-45, 732 N.E.2d 125, 129 (2000).  Resources mean "'[m]oney or any property that can be converted to meet needs.'"  Drysch, 314 Ill. App. 3d at 644, 732 N.E.2d at 129, quoting Black's Law Dictionary 1178 (5th ed. 1979).  Section 513 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) provides similarly: "[t]he court may award sums of money out of the property and income of either or both" of the child's parents as equity may require for support of the child's educational expenses.  750 ILCS 5/513(a)(2) (West 2006).

Robert argues he has shown a substantial change in circumstances since the marital settlement agreement was entered. He lost his job at Mitsubishi through no fault of his own.  He was unable to find work in his field and bought a bar and grill to become self-employed.  He had to invest money into the bar and grill to get the business going and, unfortunately, it has not yet shown a profit.  Due to his business obligations as well as other obligations such as the college expenses, child support, and the mortgage on property in LeRoy, Robert contends he has mortgaged his cabin worth $120,000 up to $80,000 and has nothing else to borrow against.  He argues he does not have sufficient

income to afford the costs of his three children's college educations, including full reimbursement of Ashley's imputed housing expenses while she is living at home.

We disagree with Robert except for the full reimbursement of Ashley's living expenses. The trial court ordered Robert to pay one-half of Ashley's living expenses and then computed it as requiring him to make two equal payments of $1,712.50 per academic year, making Robert's one-half equal to $3,425 per year. This would mean her total living expenses for a year total $6,850. At trial, however, Marshella testified living expenses for a commuter student at Lincoln College would be $3,425 per academic year and at ISU $6,994 per academic year. Marshella stated the reason she presented the evidence as to the costs at ISU was to show the $3,425 figure she was requesting per year was reasonable. Marshella showed a total of $3,425 in living expenses for Ashley. Robert is rightfully required to pay one-half of those expenses or a total of $1,712.50 per academic year. Thus, his two payments per academic year for Ashley will be $855.25 each. Further, because Robert's arrearage total included the full amount of $3,425 when he was only responsible for half that amount, it will be reduced by $1,712.50, to a total of $22,337.28.

As for the remaining college expenses, Robert is responsible for one-half as he agreed to be in the marital settlement agreement. He owns a cabin worth $120,000 and he testified it had a $23,000 mortgage. His later testimony regard-

ing the cabin as collateral for his $60,000 to $80,000 "debt-consolidation" loan need not have been believed by the trial court. He was unable to remember the amount of the loan. Robert provided no paperwork regarding either the existence of the debt-consolidation loan or any collateral for the loan. He testified he paid a $16,000 down payment on the bar and grill with a sale price of $32,000. At the time of the hearing, he testified he owed $15,000 on the bar and grill, which means the business should then have $17,000 in equity. He also owned a boat he testified was worth $6,000. Robert had sufficient collateral to obtain another loan or he could sell some of his property.

Robert lost his job at Mitsubishi through no fault of his own, but he had substantial severance and unemployment benefits and was employable. When those ran out, he chose to invest in the bar and grill, thereby depleting any reserve he had and incurring more debt when he had college-expense obligations for Brennon and knew he would likely have those obligations for both daughters in the near future. He is capable of earning in excess of $47,000 per year as shown by his net income in 2004 while he is actually in a job paying him $27,000 in gross income.

Robert argues there were less-expensive educational alternatives for his daughters although he does not argue Brennon should not have finished school at Augustana. Brennon enrolled there when Robert was still employed at Mitsubishi. However, Robert did not present any specific evidence as to the actual cost of a state school education although there was some evidence

of it in evidence introduced by Marshella and in Robert's marked exhibits not referred to in testimony.  The thrust of Robert's argument in the trial court was the change in circumstances demonstrated by his job loss and losing business investment.  His argument was not about the reasonableness of the educational expenses so much as it has been his perceived lack of resources to pay for them.

Robert also contends the trial court's finding the children have contributed to lower their education costs by obtaining financial assistance and working is somewhat misleading.  He acknowledges the children's ability to obtain scholarships and other financial assistance as a great contribution to their college expenses but he notes while they are working, Marshella reported reimbursing them for college expenses they paid from their own checking accounts.  To the extent she seeks contribution from Robert for this reimbursement, the children's employment is not helping with college expenses.

There is no definitive breakdown in Marshella's exhibits as to how much money was involved in these reimbursements by Marshella so there is no way to compute how much, if any, of these amounts are included in Marshella's requests for reimbursement from Robert.  Any such reimbursement requests of Robert from Marshella should not be made.  The children's contributions to their college expenses are just that and Robert should not be expected to reimburse Marshella if she chooses to reimburse them for their contributions.  Their financial resources are to be

taken into account when considering petitions to modify college education expenses.  See 750 ILCS 5/513(b)(1) (West 2006).

The trial court may have been skeptical about Robert's financial situation.  His testimony about start-up costs and investment in the bar and grill is not the same as his wife's testimony.  He was unsure of the amount of the debt-consolidation loan.  His testimony was contradictory as to whether the debt-consolidation loan was secured by his lake property.  Bar-and-grill patrons pay by cash, and neither he nor his spouse has reported tips received as earnings.  He obtained a parent loan to assist in paying college expenses for Brennan but used only a portion of the loan for those expenses.

We find no abuse of discretion in the trial court's order requiring Robert pay one-half of his daughters' post-high-school educational expenses as he agreed to do in the marital settlement agreement.

### B. Child Support

Child support agreed upon in the marital settlement agreement was $312.50 every two weeks until the youngest child reached 18 or completed high school, whichever was later.  Assuming this was 32% of net pay, Robert's yearly net pay was approximately $22,500 while the figures for Marshella were $30,000 in gross pay.  Support terminated on August 5, 2005, unless otherwise ordered by court.  A January 19, 2006, agreed order continued support payments until further order of the court.

Robert filed his petition to reduce child support in September 2004. His net income from October 1, 2004, to June 1, 2006, when both daughters graduated from high school was $31,174. During the same period, he lost $45,600 related to opening the bar and grill. He contends this constitutes a substantial change in circumstances.

Modification of child-support orders lies within the sound discretion of the trial court, and its decision will not be disturbed on appeal unless an abuse of discretion is found. In re Marriage of Rogers, 213 Ill. 2d 129, 135, 820 N.E.2d 386, 389 (2004). An abuse of discretion occurs in declining to modify a child-support obligation only when no reasonable person would agree with the court's decision. In re Marriage of Sassano, 337 Ill. App. 3d 186, 194, 785 N.E.2d 1058, 1065 (2003).

Child support is modifiable only upon a showing of substantial change in circumstances. 750 ILCS 5/510(a)(1) (West 2006). When determining whether there is sufficient basis to modify child support, courts consider the circumstances of the parents and the circumstances of the child. In re Marriage of Breitenfeldt, 362 Ill. App. 3d 668, 673, 840 N.E.2d 694, 699 (2005). "The trial court's determination whether a substantial change in circumstances [has] occurred is one of fact and will not be disturbed unless it is *** against the manifest weight of the evidence." In re Marriage of Armstrong, 346 Ill. App. 3d 818, 821, 805 N.E.2d 743, 745 (2004).

Robert contends there was a dramatic change in circum-

stances from the 1994 judgment.  Marshella's income increased from $30,000 to $57,000 while he lost his job in 2004.  Robert's severance package paid for the equivalent of an additional 38 weeks of salary and he received unemployment compensation.  He contends he kept up child-support payments until his benefits ran out.

Robert looked for other work but was unable to find a job using his education, skills, and experience.  Robert contends he and his new wife chose to open a bar and grill for valid reasons, self-employment.  Unable to generate sufficient cash flow within the first few months of ownership to meet all his financial obligations, Robert took a job paying only $27,000 per year.

Robert considers the bar and grill a wise financial investment and argues consideration of his income should include the loss he has incurred during the last 20 months in his child-support obligation.  He asks his child-support obligation be reduced to $50 per week.  Alternatively, ignoring the loss on the bar and grill, his net income from Fargo Paint and Glass was $359.70 per week, 28% of which would be $100.72 per week and he argues this case should be remanded for a redetermination of child support.

"[C]ourts have the authority to compel parties to pay child support at a level commensurate with their earning potential."  In re Marriage of Adams, 348 Ill. App. 3d 340, 344, 809 N.E.2d 246, 249 (2004).  "A court may impute additional income to

a noncustodial parent who is voluntarily underemployed." Adams, 348 Ill. App. 3d at 344, 809 N.E.2d at 249.

Robert contends the bulk of the bar and grill patrons pay in cash and he and Sue contend they receive no salary. The trial court could have rejected the latter contention as the judge of the credibility of witnesses.

Marshella argues the children's needs have increased while Robert refuses to pay even what he originally agreed to pay as support for his children. She contends Robert did not make reasonable efforts to seek reemployment in his field and purchasing the bar and grill without investigating why it was for sale or what the customer base was before purchasing was not a reasonable attempt to retain earnings similar to what he earned at Mitsubishi.

The fact Robert lost $46,500 related to opening the bar and grill while earning only $31,174 does not amount to a substantial change in circumstances where he made that choice. The trial court's conclusion no substantial change in circumstances occurred is not contrary to the manifest weight of evidence where Robert also owns a cabin and continues to operate a business at a loss. He was able to expend thousands of dollars to renovate the bar and grill. Before purchasing the business, Robert should have been concerned about how he would continue to support his children. The record establishes Robert was underemployed and, thus, not unable to pay previously agreed-upon child support. The trial court did not abuse its discretion in denying Robert's

petition to modify child support.

As to the trial court's termination of Robert's obligation to maintain health insurance, he contends this was not really a finding in his favor as the court also directed Robert to reimburse Marshella for one-half of her costs of maintaining insurance. The marital settlement agreement required both parents to maintain health insurance as provided by their employers. Robert argues he did not have such insurance available at the time of hearing so he was already in compliance with the order of dissolution. No reimbursement was required by that order, and given the changes in the parties' financial circumstances, Robert argues it was an abuse of discretion for the trial court to order him to reimburse Marshella for insurance she is already required to provide.

At first glance, Robert's argument has merit. However, both parties initially agreed they would each carry health insurance for the children through their employers. Robert admits he no longer carries such insurance but he is now employed at Fargo Glass and Paint and he provided no evidence he could not obtain health insurance through that employer. Absent such evidence, it was not an abuse of discretion for the trial court to order Robert to reimburse Marshella one-half of the cost of health insurance she provides the children.

### C. Contempt

The trial court found Robert in indirect civil contempt for failure to pay one-half of the children's college expenses

and failure to remain current with child support.  Section 505(b) of the Dissolution Act authorizes a court to find a payor parent in contempt for violating a support order.  Generally, such an order must include a finding the contemner's failure to comply with the order was willful.  <u>Janov v. Janov</u>, 60 Ill. App. 2d 11, 15, 207 N.E.2d 691, 693 (1965).

Whether a party is guilty of contempt is a question of fact for the trial court and a reviewing court will not disturb such a finding unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion.  <u>In re Marriage of Hardy</u>, 191 Ill. App. 3d 685, 689, 548 N.E.2d 139, 141 (1989).

Robert argues when he lost his job in February 2004 he stayed current with his obligations through 2004 due to a severance package of 38 weeks of pay and receipt of unemployment benefits.  He filed a petition to reduce child support at the end of September 2004.  In 2005, he paid $4,687.50 in child support.  In February 2006, he paid $2,812.50.  The shortfall is only $2,187.50.  In addition, Robert contends he continued to pay child support of $312.50 for 14 weeks after the youngest children graduated from high school on June 1, 2006.  In Brennon's sophomore year in college (2004-05) Robert paid $8,932,85 toward college expenses.  In 2005-06 school year, he paid $9,694.62.

Robert was unsuccessful in his job search based on his experience, skills, and education.  He bought the bar and grill and ultimately had to take a full-time job in addition to running

the business to generate income to try to meet his obligations. Meanwhile, mutual petitions of the parties remained outstanding concerning the appropriate amount of financial assistance for college and for child support.  While he admits he was not in compliance with the 1994 judgment, Robert contends his violation was not willful and he should not be held in contempt.

Failure to pay child support is prima facie evidence of contempt and the alleged contemner is obligated to show his failure to comply was not willful.  Gibson v. Barton, 118 Ill. App. 3d 576, 583-84, 455 N.E.2d 282, 287 (1983).  Because of this presumption of willfulness, the burden of proof is on Robert to show his actions were not willful. In re Marriage of Talmadge, 179 Ill. App. 3d 806, 817-18, 534 N.E.2d 1356, 1363 (1989).

Financial inability to comply with a support order is a defense to contempt.  It must, however, be shown by definite and explicit evidence.  General testimony does not meet that burden. A payor must, by testimony, present evidence establishing with reasonable certainty money disbursed for expenses other than payments on the support order was disbursed for expenses permitted by law.  See In re Marriage of Sharp, 369 Ill. App. 3d 271, 280, 860 N.E.2d 539, 548 (2006).

Marshella filed her petition for contempt on June 18, 2004, and Robert did not respond until September 30, 2004, when he filed his petition to modify child support.  Marshella had to file a petition for educational expenses on June 18, 2004, amended on August 11, 2004.  Robert did nothing until October 13,

2006, when he filed a motion to amend college-expense obligations.  He failed to cooperate during discovery, requiring Marshella to file a motion to compel and a motion for sanctions, which resulted in sanctions against Robert.  This shows disregard for the trial court's authority and lengthened the proceedings, resulting in larger attorney fees for Marshella.

By the time of the trial court hearing in January 2007, Robert was in arrears on child support, college expenses he had agreed to pay, uncovered medical expenses, and medical insurance costs in the amount of $22,337.28.  He provided no evidence he could not pay them as they were incurred.  He owned a bar and grill, which he claimed was operating at a loss.  This need not be accepted by the court, particularly when Robert did not explain how he and his wife, as well as her 12-year-old daughter, survived.  Robert also owned a cabin, property in LeRoy, a boat, and the bar and grill property, which also included Robert's apartment.  The bulk of the bar and grill's customers paid in cash, and Robert offered no real accounting of the cash.  Robert offered no justification for debts incurred and payments made for a new business in disregard of his obligation to his children.

Because finding a party in contempt for failing to comply with a court order implies a finding the failure to comply was without cause or justification, the imposition of attorney fees is allowed.  In re Marriage of Cierny, 187 Ill. App. 3d 334, 348, 543 N.E.2d 201, 211 (1989).  Where an ex-spouse's failure to pay was without cause or justification, an award of attorney fees

is mandatory by statute.  See 750 ILCS 5/508(b) (West 2006).  The trial court ordered Robert to pay $2,382.67 toward Marshella's total attorney fee bill of $5,765.34.  It could have ordered Robert to pay the entire amount.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment as modified.

Affirmed as modified.

STEIGMANN, J., concurs.

COOK, J., dissents.

JUSTICE COOK, dissenting:

I respectfully dissent.  The trial court abused its discretion and its decision is contrary to the manifest weight of the evidence.  I would reverse and remand with directions that the trial court reduce Robert's obligation to pay college expenses, eliminate Robert's obligation to pay child support, and vacate its finding of contempt.

The dissolution judgment in this case was entered in 1994, incorporating a marital settlement agreement that required each party to pay 50% of the children's college expenses and for Robert to pay $312.50 in child support every two weeks until the youngest child reached 18 (August 2005).

In 1994, Marshella was earning approximately $30,000 at her job at State Farm and Robert was apparently earning approximately $22,500 at Mitsubishi.  At the time of the hearing, in January 2007, Marshella was earning approximately $57,000 per year at State Farm.  However, Robert's position as a staff engineer at Mitsubishi was eliminated in February 2004 when the company downsized.  After the layoff, Robert applied to 25 to 30 engineering firms, without success.  Robert and his current wife then bought a bar and grill in Minnesota.  The bar and grill lost $28,000 in 2005.  It did better but still lost money in 2006.  In the Spring of 2005, Robert began working at Fargo Paint and Glass, where he earns approximately $27,000 per year, while still working 30 to 40 hours per week at the bar and grill.

Brennon began college in 2003.  Ashley and Paige began

in 2006.  Paige became 18 in August 2005, at which time child support was to end, according to the marital settlement agreement.  Robert stayed current until June 2004 by putting his payments on credit cards.

The trial court refused to relieve Robert of any of his obligation to pay 50% of college expenses, employing a broad definition of "college expenses," including living expenses during the summer recess (but denying Marshella's request that she be reimbursed for her mortgage, property taxes, and insurance).  The court found that Robert owed $26,236.78 in past college expenses, and $2,187.50 in child support, with a credit of $4,375 for amounts paid after June 1, 2006.  The court found Robert in indirect civil contempt for failure to pay one-half of the children's college expenses in a timely manner and failing to remain current with child support.  As a sanction, Robert was ordered to pay $2,382.67 as partial reimbursement for Marshella's attorney fees.  Robert could purge himself of contempt by paying $24,049.78 before April 15, 2007.

The trial court complained that Marshella had saved money for the children's college education while Robert did not. The trial court reasoned that although Robert no longer earns his Mitsubishi salary, he can borrow money to pay the college expenses.  While Robert lost his job at Mitsubishi through no fault of his own, he chose to purchase the bar and grill, which has operated at a loss.

The majority affirms the trial court's order as to

college expenses even though it agrees that Marshella should not have received credit for her reimbursement of the children for the college expenses they were able to pay themselves. Unfortunately for Robert, Marshella's exhibits did not break down how much money was involved in those reimbursements. Slip op. at 15.

The majority concedes that Robert lost his job at Mitsubishi through no fault of his own but argues that when his severance benefits ran out "he chose to invest in the bar and grill, thereby depleting any reserve he had and incurring more debt when he already had college-expense obligations" and knew he would have more in the future. Slip op. at 14. The question, however, is not whether the choice worked out successfully. "[E]conomic reversals as a result of changes in employment or bad investments, if made in good faith, may constitute a material change in circumstances sufficient to warrant a modification of a child[-]support order." Hardy, 191 Ill. App. 3d at 690, 548 N.E.2d at 142. The question is whether the choice was made in good faith. Employment changes that are voluntary must be made in good faith and not prompted by a desire to avoid obligations. In re Marriage of Waldschmidt, 241 Ill. App. 3d 7, 13, 608 N.E.2d 1299, 1303 (1993) (retirement was in good faith, not to avoid maintenance obligation). The record affords no evidence that the choice to become self-employed was in bad faith. In fact, it is a mischaracterization to describe this choice as "voluntary." Robert did not quit his job at Mitsubishi. His job was eliminated and he was forced to seek new employment. He was forced to

make a choice.

It is incorrect to say that Robert "is capable of earning in excess of $47,000 per year as shown by his net income in 2004," the year he lost his job and received severance benefits. Slip op. at 14. We should not assume that a person who earns $47,000 in one year will be able to earn that amount in future years. The loss of long-term employment is often a devastating blow from which a worker never recovers. "Certainly this court cannot find that an employment layoff and an attempt to become self-employed are attempts to evade financial responsibility." Hardy, 191 Ill. App. 3d at 690, 548 N.E.2d at 142. It appears that the bar and grill was the best employment Robert could find. After losing his job at Mitsubishi, Robert unsuccessfully applied to 25 to 30 other firms. Robert and his wife had experience in the bar and restaurant business and were familiar with the Minnesota area. Robert and his wife are working hard at the bar and grill, Robert spending 30 to 40 hours there a week in addition to a second job at Fargo Paint and Glass.

Was it a mistake for Robert to "invest in the bar and grill, thereby depleting any reserve he had and incurring more debt when he already had college-expense obligations"? Slip op. at 14. Robert was entitled to give some thought to long-term considerations. If he believed the bar and grill was likely to produce the most income over the years, Robert was entitled to take that into account. Robert was not required to insure above

all else that college expenses were paid.  A worker who "chooses" to go on strike may have his child-support payments reduced.  <u>In re Marriage of Horn</u>, 272 Ill. App. 3d 472, 477, 650 N.E.2d 1103, 1107 (1995).  In <u>In re Marriage of Webber</u>, 191 Ill. App. 3d 327, 330, 547 N.E.2d 749, 751 (1989), petitioner argued that respondent "was aware of his support obligation and the increasing needs of their children but still chose" to enroll full time in college and reduce his hours of employment to 14 hours per week.  The court nevertheless reduced respondent's child-support obligation.  "A good-faith, voluntary change in employment which results in reduced financial ability can constitute a substantial change in circumstances."  <u>Webber</u>, 191 Ill. App. 3d at 330, 547 N.E.2d at 751.  The question is whether Robert acted in good faith.  No evidence indicates that he did not.  He faithfully paid child support for many years.  He even paid child support and college expenses when he did not have sufficient income, by borrowing on his credit cards.  Why would Robert intentionally reduce his income, harming himself as well as his children?

According to the majority, "Robert had sufficient collateral to obtain another loan or he could sell some of his property."  Slip op. at 14.  The majority says that the testimony that his cabin was already collateral for an $80,000 debt "need not have been believed by the trial court."  Slip op. at 14.  What other evidence was there?  A trial court's decision should have some support in the evidence.  The majority says the bar and grill had $17,000 in equity.  Robert should have sold or mort-

gaged the bar and grill?  Giving up on the bar and grill does not sound like a solution to the parties' financial problems, it sounds like bankruptcy.  Even if we assume Robert had some borrowing ability left, was he required to sacrifice his earning power for the rest of his life to pay these college expenses?  "A child does not have an absolute right to a college education." In re Marriage of Spear, 244 Ill. App. 3d 626, 630, 613 N.E.2d 358, 360 (1993).  Even if we were talking about food and shelter, a basic principle in setting support is that the amount of support should be based on current conditions.  See In re Marriage of Carpel, 232 Ill. App. 3d 806, 819, 597 N.E.2d 847, 857 (1992).  It may be appropriate to require Robert to cosign federally insured student loans for his children.  It is not appropriate to saddle him for the rest of his life with debts he will never be able to repay.

Finally, I disagree that sanctions were properly imposed for contempt in this case.  "[A] clear defense to contempt exists where the failure of a person to obey an order to pay is due to poverty, insolvency, or other misfortune, unless that inability to pay is the result of a wrongful or illegal act."  In re Marriage of Betts, 155 Ill. App. 3d 85, 100, 507 N.E.2d 912, 922 (1987).  Criminal contempt sanctions are retrospective in nature and punish the contemnor for past acts that he cannot undo.  "'Civil contempt proceedings have two fundamental attributes:  (1) the contemnor must be capable of taking the action sought to be coerced, and (2) no further contempt sanc-

tions are imposed upon the contemnor's compliance with the pertinent court order.'" (Emphasis added.) <u>Helm v. Thomas</u>, 362 Ill. App. 3d 331, 334, 839 N.E.2d 1142, 1144-45 (2005), quoting <u>Pancotto v. Mayes</u>, 304 Ill. App. 3d 108, 111, 709 N.E.2d 287, 289 (1999). "The purging provision in a civil contempt sanction for nonpayment must be based upon a contemnor's ability to pay." <u>Betts</u>, 155 Ill. App. 3d at 103, 507 N.E.2d at 924-25 (requiring payment of $12,950 all at once was unrealistic). In <u>Hardy</u>, the trial court entered judgment on child-support arrearages in the amount of $15,500, but it stayed enforcement until further order of the court where respondent had been laid off and attempted to become self-employed. <u>Hardy</u>, 191 Ill. App. 3d at 687, 548 N.E.2d at 140. Robert clearly is not capable of paying $24,049.78 at any time in the near future. The sanction that Robert pay $2,382.67 as partial reimbursement for Marshella's attorney fees lacked any coercive element and constituted instead a penalty for a prior act.