2022 IL App (1st) 201100-U

Nos. 1-20-1100 & 1-21-0212 cons.

Order filed March 2, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| *In re* MARRIAGE OF | ) |
| | ) Appeal from the |
| STEVE FANADY, | ) Circuit Court of |
| | ) Cook County. |
| Petitioner-Appellant, | ) |
| | ) No. 18 D 008662 |
| and | ) |
| | ) Honorable |
| GINA DEMKE FANADY, | ) Daniel A Trevino, |
| | ) Judge Presiding. |
| Respondent-Appellee. | ) |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the judgment of the circuit court over petitioner's contentions that the court erred in imputing income to him in the amount of $500,000 for purposes of calculating child support, that the court erred in refusing to admit into evidence an order from the Supreme Court of Belize, that the court erred in permitting respondent to call appellant Steve Fanady as an adverse witness in contravention to a discovery sanction order, that the court erred in allocating joint decision-making responsibilities to the parties for their minor child, and that the court erred in awarding respondent attorney fees on a petition for rule to show cause.

¶ 2     This appeal arises following the circuit court's entry of a judgment for dissolution of the marriage between petitioner Steve Fanady (Steve) and respondent Gina Demka Fanady (Gina) (Dissolution Judgment). The court also entered a judgment allocating parental responsibilities and establishing a parenting plan for the parties' minor child, S.F. (Allocation Judgment).

¶ 3     On appeal, Steve raises several contentions regarding the trial proceedings, the Dissolution Judgment, and the Allocation Judgment. Steve first contends that that court erred in imputing income to him in the amount of $500,000 in its award of child support to Gina. Steve also asserts that the court erred in refusing to admit into evidence an order from the Supreme Court of Belize. Steve next maintains that the court erred in allowing Gina to call him as an adverse witness pursuant to section 2-1102 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1102 (West 2018)) where the court had previously entered an order barring Gina from calling any witnesses based on discovery violations. Steve also contends that the court erred in ordering the parties to make joint decisions for S.F. in the Allocation Judgment where both parties agreed that they were not able to make joint decisions. Finally, Steve asserts that the court erred in granting Gina attorney fees for a petition for a rule to show caused filed against Steve, where the court denied the petition. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 4                                 I. BACKGROUND

¶ 5     In October 2018, Steve filed the instant petition for dissolution of marriage pursuant to the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (750 ILCS 5/101 *et seq.* (West 2018)). Steve subsequently filed an amended petition in which he alleged that the parties were married on March 25, 2011, but that the parties had been living separate and apart since November 2016, and irreconcilable difference had caused the irretrievable breakdown of the marriage. Steve also alleged that the parties had one child, and had not acquired any marital property. Steve

represented that he was retired and did not earn any income, but Gina earned an income sufficient to support herself and provide child support. Steve sought an order from the circuit court dissolving the parties' marriage, allocating parental rights and responsibilities, requiring Gina to pay child support to Steve, and awarding each party their non-marital property.

¶ 6                                      A. Steve's Testimony

¶ 7       Steve testified that he majored in economics and started at the Chicago Board of Trade as a runner when he was 19 years old. When he was 21 years old, he became a member of the Chicago Board of Trade as trader. Steve testified that he was a "market maker, broker, trader" at the Chicago Board of Trade until he retired in 2007. Steve testified that he is able to support himself because he is the beneficiary of the SF Trust, which was created in 1995. The SF Trust is a family trust that was created "to place all of the family's assets inside of a trust so they're protected." Steve testified that the trust was "replaced" in 2009 because of an "anomaly" in the original trust documents. All of the assets from the 1995 trust were funneled into the 2009 trust. Steve testified that he knew Gina at the time the trust was replaced, but they were not married or engaged, and Gina did not have any rights to trust assets or property. The SF Trust was restated again in 2016 after Gina filed for divorce. Steve testified that it was the decision of the trustee and the protector to restate the trust in 2016, and he did not know the basis for their reasoning.

¶ 8       The SF Trust was incorporated in Belize and drafted under the laws of Belize. Steve testified that he did not know who chose the trustee or protector of the trust, and did not know how the trustee or protector was chosen. He testified that he had never met the trustee or protector and was not familiar with them outside their capacities as trustee and protector. Steve testified that he did not know how much money was in the trust, and had no say in how the assets of the trust were managed or invested. Steve sought to introduce into evidence an order from the Supreme Court of

Belize related to the trust. Steve asked the court to take "judicial notice" of the order. The court sustained Gina's objection, finding that it could not take judicial notice of court orders from foreign jurisdictions. Steve testified that the Supreme Court of Belize order concerned the trust's obligation to comply with court orders from different jurisdictions.

¶ 9    Steve testified that he also had a membership in "another exchange," the Chicago Board Options Exchange (CBOE) starting in 2003. Steve testified that at some point he owned as a part of a partnership 120,000 shares of CBOE stock. Steve's testimony regarding the sale of 120,000 shares of CBOE stock in 2006 was contradictory and ambiguous. He testified that when the stock was sold, he received approximately $1.2 million. He first testified that he had no recollection of what he did with $1.2 million proceeds. He later testified, however, that he funded the SF Trust with CBOE stock. He changed his testimony later, however, testifying that he did not think the $1.2 million was deposited into the trust, but may have gone toward the purchase of a home. He later testified that the partnership actually owned 240,000 shares of CBOE stock. He testified that the other 120,000 shares were the subject of a TRO. Steve testified that the SF Trust, or one of the entities associated with the trust, may or may not have also been a member of the partnership that owned the CBOE stock.

¶ 10   Steve also testified that since 2008, he had been the Public Director of the Minneapolis Grain Exchange, for which he was paid a stipend of $4,800 per year. Steve testified that he used the stipend to pay for a life insurance policy.

¶ 11   Steve acknowledged that on his financial affidavit, he listed a yearly gross income of $4,800 which represented his stipend as Public Director of the Minneapolis Grain Exchange. He testified that the trustee of the SF Trust paid for his "life expenses." Steve listed his total gross monthly income as $3,108.33, which he testified was the "average monthly expenses" that he

incurred "maintaining a household and personal expenditures." Steve testified that he had lived on that amount of income since 2011 or 2012, including while he was married to Gina, and after S.F. was born. Steve explained that he has an American Express credit card that is in the name of the trust. He charges items to the credit card and the trust pays the bill. The trust can deny expenses that are not "ordinary." Steve explained that he could not charge his legal expenses in the current dissolution proceedings on the American Express credit card because it was not an "ordinary" expense. Steve testified that the trustee and the protector make a unified decision of whether the trust will pay a particular charge. Steve testified that he did not file tax returns because he did not have enough income for reportable income.

¶ 12    Steve further testified that he could not co-parent with Gina because Gina refused to co-parent with him. Steve testified that Gina would not communicate with him about S.F., and would not comply with parenting orders. Steve testified that although he would try to communicate with Gina, they would still constantly disagree on important issues, such as healthcare decisions for S.F.

¶ 13                                    B. Gina's Testimony

¶ 14    Gina testified that she earned $54,000 a year through her employment. Gina testified that Steve handled their finances while they were married and she had an American Express credit card that was paid for by the SF Trust. She would also occasionally receive checks from the trust. She agreed with the report from Dr. David Finn, who conducted an independent evaluation of the parties pursuant to section 604(b) of the IMDMA, that she and Steve could not make decisions together. She testified that she and Steve had trouble communicating on "[e]very single issue." Gina stated that she wanted to be the sole decision maker for S.F. and wanted to make major decisions regarding S.F.'s education, medical issues, and extracurricular activities. Gina

acknowledged that she could share decision-making with Steve with regard to S.F. "major medical" decisions and religious decisions. Gina also wanted to be the primary residential parent and testified that the 50/50 split between her and Steve was "not workable."

¶ 15                    C. Judgment for Dissolution and Allocation Judgment

¶ 16    The court entered the Dissolution Judgment on September 18, 2020. In the Dissolution Judgment, the court found that Gina's income was $54,000 per year. The court found with regard to Steve that he was voluntarily unemployed. The court found that Steve "lacked credibility" in describing his previous involvement with the CBOE, the Chicago Board of Trade, and various entities listed in financial affidavit. The court found that during his testimony, Steve "intentionally evaded answers that would have more accurately described his role in these entities," including whether any of these entities held marital property. The court observed that Steve testified that he did not recall where he deposited the $1.2 million proceeds from his sale of CBOE shares in 2006. The court stated these facts were important to the court's determination of child support and child expense obligations.

¶ 17    The court then discussed the SF Trust. The court noted that Steve put all of his property in the SF Trust, but could not describe any of that property. The court observed that Steve denied any knowledge of the assets of the trust, but acknowledged that he was a beneficiary, and that the trust paid his expenses. The court noted that Steve used funds from the trust to pay for the child representative and his attorneys in the present proceeding. The court found that there was a "significant disparity" in Steve's favor "as to income and property to which he has access to," including the SF Trust. The court observed that Steve had not filed tax returns because he does not have sufficient income. The court found, however, that Steve provided "evasive responses to questions pertaining to any interests he had in business entities listed in his financial affidavit ***

- 6 -

as well as income related to alleged sales or divestments he may have made." The court found that Steve's assertion in his financial affidavit that he had minimal income was not consistent with the sums paid on his behalf and per his request in the dissolution litigation. The court observed that Steve's financial affidavit listed certain entities as having been paid by the SF Trust. However, when questioned about those payments, Steve refused to clarify. The court concluded that "[t]he record contains many references to a significant disparity in [Steve's] favor as to significant income and property to which he has access and to which he is a beneficiary."

¶ 18    The court determined that the evidence therefore supported a finding of a child support obligation for S.F. in favor of Gina and against Steve. Based on the court's discussion of Steve's finances, the court imputed income to Steve in the amount of $500,000 as "potential income." The court based this amount on Steve's "qualifications, work history, job opportunities, income producing assets, and earning levels" pursuant to sections 505(a)(3.2) and 505(a)(1.5) of the IMDMA. Based on this imputed income, the court ordered Steve to pay $2,127 per month in child support to Gina.

¶ 19    On February 7, 2022, this court remanded this matter to the trial court for the limited purpose of allowing the trial court to enter an order explaining how it calculated Steve's imputed income of $500,000 and his child support payments of $2,127. In accordance with that order, the circuit court entered an explanatory order stating that it adopted Gina's calculations in her closing argument of Steve's imputed income and child support obligation. In her closing argument, Gina asserted that Steve's financial disclosure was "totally inaccurate," and that the court should base his income and child support obligation on his testimony of "undisclosed earnings *** at a minimum of $14,000,000." Gina alleged that 4% of these minimum earnings equaled $560,000, "and when applying the [Department of Health and Human Services guidelines, exceeds the

maximum guidelines of $500,000 annually which calculates at $2,127.00 per month."[1] Thus, Gina's request for the amount of child support was based on guidelines provided by the Department of Health and Human Services, which provided for a maximum support amount of $2,127 based on an income of $500,000. Gina requested a deviation from these guidelines and sought a monthly support amount of $3,000 based on an imputed income of $560,000.

¶ 20    The trial court's Dissolution Judgment reflected that it accepted Gina's calculation of Steve's imputed income, but declined to deviate from the Department of Health and Human Services guidelines. The court therefore imputed a "maximum guidelines income" to Steve in the amount of $500,000, and ordered him to pay a "guidelines child support" of $2,127. In its explanatory order, the court stated that it made the decision to adopt Gina's calculation of Steve's imputed income and the amount of child support based the court's "consideration of all of the evidence presented, the credibility of the witnesses, witnesses' demeanor and manner while testifying, the exhibits that were admitted, stipulations, arguments of counsel, applicable case and statutory law, and relevant portions of" the IMDMA.

¶ 21    In the Allocation Judgment, the court set forth the allocation of parental responsibilities and parenting plan. The court ordered that Steve and Gina would share parenting responsibilities for S.F., and would share parenting time. The court found that it was in S.F.'s best interests if the parties consulted with each other to jointly make all significant decisions for S.F., including those related to her education, extracurricular activities, healthcare, and religion. The Allocation Judgement also set forth a procedure for dispute resolution should the parties fail to agree on significant decisions.

---

[1]We observe that Gina's written closing argument makes reference to an "attached Illinois Child Support Guideline calculation," but no such attachment appears with her closing argument.

¶ 22                              D. Postjudgment Proceedings

¶ 23    Following the circuit court's judgment, Steve filed a notice of appeal, listing both the Dissolution Judgment and the Allocation Judgment as the judgments appealed from.

¶ 24    Subsequently, both parties filed postjudgment motions. In his posttrial motion[2], Steve asserted, *inter alia*, that the court erred in imputing income to him for the purpose of awarding child support. Steve contended that the child support order of $2,127 a month based on an imputed income of $500,000 per year was unsupported by any evidence in the record and was in contravention to existing case law. Steve asserted that the evidence presented showed that he was a retired former stock trader, who retired four years before the marriage and had no other income. Steve maintained that there was no evidence in the record to suggest what sort of employment he would qualify for or what his earnings could be if he were employed. Steve contended that the only evidence in the record regarding his finances is that he is the Public Director for the Minneapolis Grain exchange and pays his personal expenses using an American Express card maintained by the SF Trust.

¶ 25    Steve also contended that the court's error in imputing income was compounded by its error in refusing to admit the order from the Supreme Court of Belize. Steve contended that the Belize judgment was properly certified under the Rules of Evidence and was therefore properly admissible. Steve next contended that the court erred in allowing Gina to call him as an adverse witness pursuant to section 2-1102 of the Code. Steve asserted that in March 2019, the court barred Gina from calling any witnesses except herself and Dr. Finn.

---

[2]We note that Steve's postjudgment does not appear to be part of the common law record filed on appeal. However, Gina filed a response to Steve's motion in which she inserted her responses to the allegations in the motion in-line, line-by-line in the document. Thus, the original text of Steve's postjudgment motion is preserved in Gina's response.

¶ 26    In her postjudgment motion, Gina asserted, *inter alia*, that the court erred in appointing a child representative, and that the court erred in apportioning present and future costs and fees based on the parties' respective earnings. Gina also asked the court to strike the appointment of the parenting coordinator.

¶ 27    The circuit court disposed of both postjudgment motions in separate written orders entered on the same day. The court denied the relief sought by Steve with the exception of some small adjustments to the language used in both the Dissolution Judgment and the Allocation Judgment. The court also denied the relief sought by Gina, with the exception of striking the appointment of the parenting coordinator.

¶ 28    Steve subsequently filed an amended notice of appeal adding the court's ruling on his postjudgment motion to the notice of appeal along with the Dissolution Judgment and the Allocation Judgment.

¶ 29                    E. Attorney Fees on Emergency Motion

¶ 30    Proceedings continued in the circuit court to resolve, among other things, Gina's request for attorney fees related to an emergency motion to compel Steve to comply with the parenting order she filed in April 2020. The court awarded Gina attorney fees related to the prosecution of the emergency motion and indicated that the order on fees was a final and appealable order pursuant to Supreme Court Rule 304 (eff. Mar. 8, 2016). Steve subsequently filed a notice of appeal with regard to the court's award of fees in appeal number 1-21-0212. That appeal was consolidated with the instant appeal under case number 1-20-1100.

¶ 31                    II. ANALYSIS

¶ 32    On appeal, Steve contends that the court erred in imputing income to him in the amount of $500,000 in awarding child support to Gina. Steve also asserts that the court erred in refusing to

admit into evidence an order from the Supreme Court of Belize. Steve next contends that the court erred in permitting Gina to call him as an adverse witness despite the fact that the court had previously entered an order barring Gina from calling any witnesses. Steve also maintains that the court erred in ordering the parties to make joint decisions in the Allocation Judgment where both parties agreed that they were not able to make joint decisions. Finally, Steve contends that the court erred in granting Gina attorney fees based on a rule to show cause against Steve, which the court denied.

¶ 33                                    A. The Parties Briefs

¶ 34    Before we reach the merits of this appeal, we first must address the state of the parties' briefs. Steve's brief, for his part, contains multiple violations of Supreme Court Rule 341(h) (eff. Oct. 1, 2020). Subsection (h)(6) requires appellant briefs to contain a statement of the facts that is "necessary to an understanding of the case, stated accurately and fairly without argument or comment." In contravention of this well-established rule, Steve spends pages of statement of facts critiquing the evidence presented, or lack thereof, regarding his finances. He lists dozens of points that he presumably believes are deficiencies in Gina's case against him, such as: "There is no evidence in the record of what Steve could earn as an options trader, either self-employed or employed by some trading company, if he could find such employment." In addition to this bulleted list about his finances, along with a litany of other issues, one of the subheadings in his Statement of Facts simply reads: "Gina was not a credible witness." As this does not appear to be a finding by the court, these points are better served presented in the argument section of Steve's brief. Although we are cognizant of Steve's *pro se* status on appeal, *pro se* litigants are expected to be familiar with the supreme court rules, and are not entitled to more lenient treatment than licensed attorneys. *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶¶ 77-78.

¶ 35 Somewhat ironically, in his reply brief, Steve contends that Gina's brief fails to comply with Rule 341 because the statement of facts in her brief contains comment and argument in violation of the rule. Rule 341 does not require the appellee's brief to contain a statement of facts at all. Ill. S. Ct. R. 341(i) (eff. Oct. 1, 2020). Where an appellee elects to include a statement of facts, however, she was must also comply with Rule 341(h)(6). *Hurlbert v. Brewer*, 386 Ill. App. 3d 1096, 1100 (2008). We agree with Steve that Gina has failed to comply with Rule 341(h)(6) where her statement of facts section includes commentary on Steve's testimony and his submissions at trial in addition to other arguments more appropriate for the argument section of the brief.

¶ 36 The purpose of this discussion of the parties' briefs is not intended to reprimand or embarrass the parties for the state of their briefs. Nor do we believe that these deficiencies require striking the parties' briefs either in whole or in part. See *Knight v. Haydary*, 223 Ill. App. 3d 564, 580 (1992). Rather, we note these deficiencies because, as the rule states, this court is entitled to have the factual record stated fairly and accurately. Neither party's brief succeeds at this mandate. Rather, both briefs present subjective, self-serving commentary on the trial court proceedings and limit the discussion of the facts to those facts that support their positions on appeal. Indeed, it is nearly impossible to determine from a reading of the briefs what circumstances gave rise to the either the Allocation Judgment or the Dissolution Judgment in this case. Nonetheless, none of these deficiencies hinder this court's review as the court was required to examine the entire factual record in order to address the contentions raised on appeal. See *Canel and Hale, Ltd. v. Tobin*, 304 Ill. App. 3d 906, 911 (1999). "We note, though, that inappropriate argument in the statement of facts tends to weaken rather than strengthen an advocate's persuasiveness." *Knight*, 223 Ill. App. 3d at 580. Accordingly, we will proceed to address the contentions raised on appeal.

¶ 37                                    B. Imputation of Income

¶ 38    Steve first contends that the court erred in imputing income to him in the amount of $500,000 in awarding child support payments to Gina. Steve asserts that the only evidence presented concerning his finances was that he was a retired stock options trader who paid for his personal expenses using a credit card from the SF Trust. Steve maintains that it was undisputed that the SF Trust was non-marital property, and that the trust did not have any income or profits. Steve asserts that Gina failed to present any evidence from which the court could impute income, such as Steve's qualifications, the relevant job market for his skills, or his earning potential. Steve asserts that the only income that the court could reasonably use to determine the amount of child support was his stipend from the Minneapolis Grain Exchange, and the funds Steve received each month from the trust, which averaged $3,108. Steve asserts we should therefore remand this matter to the trial court with instructions for the court to re-compute the amount of child support without imputing any income to Steve.

¶ 39    "[I]n determining income for child support purposes, the trial court has the authority to compel a party to pay at a level commensurate with his earning potential." *In re Marriage of Pratt*, 2014 IL App (1st) 130465, ¶ 26 (citing *In re Marriage of Sweet*, 316 Ill. App. 3d 101, 106 (2000)). If present income is uncertain, however, the trial court my impute income to the payor. *Id.* In order to impute income to a party, the court must find that the party "(1) is voluntarily unemployed, (2) is attempting to evade a support obligation, or (3) has failed to reasonably take advantage of an employment opportunity." *In re Marriage of Sinha*, 2021 IL App (2d) 191129, ¶ 41 (citing *In re Marriage of Gosney*, 394 Ill. App. 3d 1073, 1077 (2009)). " 'The findings of the trial court as to net income and the award of child support are within its sound discretion and will not be disturbed on appeal absent an abuse of discretion.' " *In re Marriage of Pratt*, 2014 IL App (1st) 130465, ¶

22 (quoting *In re Marriage of Breitenfeldt*, 362 Ill. App. 3d 668, 675 (2005)). Further, we "allow the trial court's factual conclusions to stand unless they are against the manifest weight of the evidence." *In re Marriage of Eberhardt*, 387 Ill. App. 3d 226, 233 (2008).

¶ 40    Here, the court found that Steve was voluntarily unemployed, and stated that its imputation of income to Steve was based on section 505(a)(3.2) of the IMDMA. Section 505(a)(3.2) provides:

> "Unemployment or underemployment. If a parent is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income. A determination of potential income shall be made by determining employment potential and probable earnings level based on the obligor's work history, occupational qualifications, prevailing job opportunities, the ownership by a parent of a substantial non-income producing asset, and earnings levels in the community." 750 ILCS 5/505(a)(3.2) (West 2018).

¶ 41    Steve contends that the court erred in imputing income to him on the basis of his unemployment because he retired before the marriage, and because Gina failed to present any evidence regarding his qualifications, job opportunities, or potential earning level. However, the court's imputation of income to Steve was not based on evidence, or lack thereof, presented by Gina. Rather, the court's imputation of income appeared to be based on two factors. First, the court commented at length on Steve's evasive testimony and lack of credibility regarding his sale of the CBOE shares and his involvement in various entities. In the judgment for dissolution, the court found that "Steve lacked credibility in describing his previous involvement and/or membership with the [CBOE], the Chicago Board of Trade[,] and in various entities listed in his Financial Affidavit." The court found that Steve "intentionally evaded" answers that would have more accurately described his involvement with these entities.

- 14 -

¶ 42    Indeed, the court expressed its skepticism of Steve's testimony during trial. For instance, while Gina's counsel was questioning Steve regarding the number of seats he owned on the Chicago Board of Trade between 2000 and 2007, Steve testified that he could not recall without records in front of him. After answering several questions with either "It's possible," "I don't know," or "Without records in front of me I don't know," the court addressed Steve directly.

> "THE COURT: I'm just going to caution you that I'm the one who is listening to all this.
>
> [STEVE]: I understand that.
>
> THE COURT: So it's me who is listening to this.
>
> [STEVE]: I understand.
>
> THE COURT: I'm hearing the questions an[d] I'm hearing the answers.
>
> [STEVE]: But there's—
>
> THE COURT: I just want everyone to understand that."

A short time later, Gina's counsel was asking Steve about the SF Trust. Gina's counsel asked Steve who funded the trust. Steve responded that he originally funded the SF Trust with $10,000. Gina's counsel asked Steve how much he added to that $10,000 in the trust, and Steve responded, that "Without records in front of me I couldn't tell you." Gina's counsel asked if it was more than $1 million. Steve's counsel objected, but the court overruled the objection "because the witness is being vague on responses so I'm going to allow [Gina's counsel] to *voir dire* him until we can get some answers."

¶ 43    The court was also concerned with Steve's testimony regarding the CBOE. As noted, Steve first testified that he did not recall what he did with the $1.2 million of proceeds from the sale of

the CBOE shares. He then testified that the proceeds were put in the trust, but later testified that it was not put in the trust, but that the $1.2 million may have been used to purchase a home. After Steve testified that the proceeds were used to purchase a home, the court asked Steve: "So you're now changing your testimony." Steve responded that he was merely trying to recall what he did with the funds. The court addressed this contradictory testimony in the Dissolution Judgment stating that "[t]hese facts are important to this Court's determination of child support and child expense obligations, which are in the best interest of the minor child."

¶ 44   Finally, the court was also concerned with Steve's testimony regarding various entities he listed on his financial affidavit. On his financial affidavit, Steve listed his income from "Distributions and Draws" as $2708.33. Steve attached an additional information form to his financial affidavit where he explained that regarding the distribution and draws category, the sum of "$7410.33" was paid from the SF Trust "corpus."

> "The trust pays the funds to Limited Liability Companies (in 2016 these were Alpha General Financial LLC and Gamma, LLC, both Delaware LLC's [*sic*]), which are owned by Pantheon, LLC (a Nevis LLC), which in turn is owned and managed by Orion Trust Services, a Belize company. Steve Fanady has no authority to instruct Pantheon or Orion Trust Services to distribute any funds, and those entities only act according to the terms of the 2009 SF Trust. The payments are from the trust corpus and is not income, therefore no tax returns are required to be filed."

¶ 45   At trial,  Gina's counsel was asking Steve questions about various LLCs he had listed on his financial affidavit. Steve repeatedly testified that he had no involvement with the LLCs and did not know why he listed them on his financial affidavit. After Steve testified that he could not understand Gina's counsel's questions, the court addressed Steve again:

"THE COURT: Mr. Fanady, I don't want to get involved in having to ask you questions myself, but I'm very close to starting to have to do that, and trust me I will ask them the right way.

[STEVE]: I get it.

THE COURT: Okay?

\*\*\*

THE COURT: So I think what we're going to do here is that we're just going to be here all day long and all night until every last question is asked with the exact trade specific—

\*\*\*

—vernacular, that's an option. But based on my job to run this courtroom as efficiently for the parties and the taxpayers we're not going to do that. Let's just—we're nearing the end of your testimony. I'm just asking you to please listen to the question and answer truthfully as you have been doing, and let's move forward. Let's not play games where games don't have to be played."

In the Dissolution Judgment, the court found that Steve intentionally evaded answers that would have more accurately described his role in these entities, "whether or not he had or presently has an ownership interest in same, when and how he divested himself of any interest, and whether or not these entities hold any property which can be construed as marital."

¶ 46    The evidence also showed that Steve had access to income far greater than he reported on his financial affidavit or testified to at trial. For instance, the court noted that Steve used funds from the trust to pay the child representative in this case, which totaled in excess of $90,000. Steve

also represented that he was paying his attorneys from the case with funds from the trust.[3] Steve was represented by two separate attorneys throughout the proceedings, which lasted years. He also used money from the trust to pay for month-long trips to Greece with S.F. Where a party's personal spending exceeds his net income, and the source of such money is unexplained, such money should be considered as an additional resource for child support. *In re Marriage of Tegeler*, 365 Ill. App. 3d 448, 461 (2006). Accordingly, while Steve's employment income may have decreased since his retirement in 2007, his lifestyle and spending power has seemingly remained unaffected. See *In re Marriage of Verhines and Hickey*, 2018 IL App (2d) 171034, ¶ 93.

¶ 47    Thus, the court's first basis for imputing income to Steve was based on his apparent access to substantial assets. Indeed, section 505(a)(3.2) explicitly contemplates that a court may impute income based on a parent's "ownership *** of a substantial non-income producing asset." 750 ILCS 5/505(a)(3.2) (West 2018). The court found that Steve was intentionally evasive when discussing his assets, suggesting that Steve perhaps had access to more assets than he disclosed. The court therefore determined that by intentionally obscuring his assets, Steve was attempting to avoid a support obligation. See *In re Marriage of Sinha*, 2021 IL App (2d) 191129, ¶ 41. In such a circumstance, the court may, in its discretion, impute income to the parent. *Id.*

¶ 48    Secondly, the court also imputed income to Steve based on its finding that he was voluntarily unemployed. The court discussed Steve's qualifications, work history, and ability to earn income. Steve asserts that this was in error because Gina failed to present any evidence about job opportunities or the amount Steve could earn if he were employed. Steve contends that the

---

[3]Steve's testimony regarding whether he was paying his attorneys with funds from the trust was inconsistent, but based on the court's ruling, it seems clear that at least part of his legal expenses were paid for using disbursements from the trust.

court erred in considering him voluntarily unemployed because he retired years before the marriage and Gina knew he was retired when they married. Regardless of the reasoning for Steve's unemployment, this court has recognized that the trial court has the authority to set a party's support obligation at a level appropriate to the party's skills and experience. *In re Marriage of Sweet*, 316 Ill. App. 3d at 107. While a party's desire to be underemployed or unemployed is not insignificant, "the interests of the other spouse and the children may sometimes take precedence." *Id.* As such, while Steve represents that he prefers to be retired and enjoys a modest lifestyle based solely on his disbursements from the SF Trust, Gina's and S.F.'s interests may take precedence. The trial court cannot direct Steve to work a specific job against his will. *Id.* However, the court may direct him to pay support "commensurate with a wage he could earn if he sought employment in an occupation for which he is trained, and has the present ability to perform." (Internal quotation marks omitted.) *Id.* (quoting *In re Marriage of Resch*, 381 N.W. 2d 460, 462 (Minn. App. 1986)). There was extensive evidence presented regarding Steve's education and employment history. Although Steve asserts that he would be unfit to return to his previous employment given his time out of work, this does not mean he is unable to seek any employment in the field for which he is trained. It is well-established that the court in family law proceedings has the "authority to compel parties *** to seek more lucrative employment, or to pay support at a level as if they had done so." *In re Marriage of Sweet*, 316 Ill. App. 3d at 106.

¶ 49    Finally, we note that although Steve does not challenge the *amount* of imputed income or child support payments, the court stated in its explanatory order that it based the amount of imputed income and child support payments on Gina's calculations in her written closing argument and amended closing argument. The court stated it accepted Gina's calculations of these amounts based on its "consideration of all of the evidence presented, the credibility of the witnesses, witnesses'

demeanor and manner while testifying, the exhibits that were admitted, stipulations, arguments of counsel, applicable case and statutory law, and relevant portions of" the IMDMA. We find no abuse of discretion based on the circuit court's determination of Steve's imputed income or his child support obligation. See *In re Marriage of Liszka*, ¶ 47 (citing *In re Marriage of Gosney*, 394 Ill. App. 3d 1073, 1078 (2009)). In addition, the evidence discloses that Steve's lifestyle supports this imputed income. Accordingly, we find that the trial court did not abuse its discretion in imputing income to Steve in the amount of $500,000 and in determining the amount of child support based on that imputed income.

¶ 50                    C. Order of Supreme Court of Belize

¶ 51    Steve next contends that the court erred in refusing to admit an order from the Supreme Court of Belize into evidence. Steve asserts that the Supreme Court order was properly certified and authenticated under the Rules of Evidence and Steve wanted to introduce the order to show that the SF Trust could not disburse funds directly to Gina or S.F. Steve asserts that the trial court's order is now in conflict with the Supreme Court of Belize order because Steve cannot pay child support to Gina from the trust. It is well-settled that the admissibility of evidence is a matter within the sound discretion of the trial court, and we will not overturn the court's decision absent an abuse of that discretion. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 52    At trial, Steve's counsel sought to admit the order from the Supreme Court of Belize during Steve's testimony regarding the SF Trust. At that time, Steve's counsel asked the court to take judicial notice of the order, which counsel represented was "authenticated." Gina's counsel objected, arguing that the court could not take judicial notice of an order from a foreign jurisdiction. The court sustained Gina's objection, stating "this Court doesn't recognize foreign orders ***." Steve's counsel responded: "That's fine, Judge." Nonetheless, the court allowed Steve

to testify to his "understanding" of the order. Steve testified that under the order, the trustee of the SF Trust is not obligated to act in accordance with any order from a foreign jurisdiction.

¶ 53 Steve's counsel attempted to elicit testimony from Steve about why the order was entered, but the court sustained Gina's objections to the testimony on the basis that Steve lacked personal knowledge and that the questions called for a hearsay response. Ultimately, Steve merely testified that the order was put into place so that the trustee would not be bound by any order of a foreign court. On redirect examination, Steve's counsel showed Steve a "Fixed Date Claim Form" that was filed by the trustee, Orion Trust Services, against Gina in Belize. Steve explained that the Fixed Date Claim Form was an attempt by the trustee to seek instruction about whether orders from another jurisdiction could affect how the SF Trust operates in Belize. Steve explained that as a result of the Belize Supreme Court ruling based on the Fixed Date Claim Form, Gina could not file an action against the trust in Belize based on a judgment from another jurisdiction. However, when Steve attempted to submit the Fixed Date Claim Form into evidence, the court sustained Gina's objection to the admission. The court found that Steve was not a party to the court case in Belize and the document was "hearsay" and "a number of other things."

¶ 54 Steve maintains that it was error for the trial court to not admit the order from the Supreme Court of Belize. The record shows, however, that Steve attempted to admit the order only once, when he asked the court to take judicial notice of the order. When the court sustained Gina's objection to taking judicial notice of the order, Steve did not protest, and did not seek to admit the order a second time or under a different theory. However, the court permitted Steve to testify about both the order itself and the Fixed Date Claim Form that was the basis for the order. Essentially, Steve testified that the Supreme Court order provided that the trustee of the SF Trust could not be compelled by an order of the foreign country to distribute funds from the trust. Thus, the court

permitted Steve to introduce the substance of the order despite the fact that the court did not take judicial notice of the order or allow it into evidence. We therefore find that Steve suffered no prejudice as a result of the trial court's ruling. See *Smith v. Black & Decker (U.S.), Inc.*, 272 Ill. App. 3d 451, 455 (1995) ("We note that evidentiary rulings rest within the sound discretion of the trial court, and absent an abuse of discretion resulting in prejudice to the party objecting, those rulings will not be disturbed on appeal.").

¶ 55    We further find Steve's contention that the trial court's order and the Belize Supreme Court order are now in conflict unpersuasive. Steve essentially contends that he cannot pay his support obligation because his only source of income is derived from the distributions from the trust and the trust is not permitted to make distributions directly to Gina or S.F. Steve asserts that based on the Supreme Court of Belize order, Gina could not use the Dissolution Judgment to force the trustee in Belize to make distributions to her from the trust. Steve seems to suggest that he would be unable to pay his support obligation with funds distributed directly to him from the trust. First, this argument would imply that Steve is unable to pay any support obligation, which simply cannot be the case. Secondly, as the trial court pointed out, Steve used trust money to pay the child representative and his attorneys. Thus, it is clear Steve has the capacity to transfer trust funds to other people. Finally, the court did not order the SF Trust to disburse funds directly to Gina or S.F. The support obligation is Steve's, not the trust's. Thus, it is immaterial whether the trust can be ordered to disburse funds directly to Gina. The only relevant consideration is whether Steve has access to funds from which he can fulfill his support obligation, whether those funds come from the trust or not. As the trial court found, and as discussed above, he does. Therefore, we find no error resulting from the trial court's refusal to take judicial notice of the order from the Supreme Court of Belize.

¶ 56                          D. Steve as an Adverse Witness

¶ 57    Steve next contends that the court erred in permitting Gina to call him as an adverse witness pursuant to section 2-1102 of the Code. 735 ILCS 5/2-1102 (West 2018). Steve points out that the trial court had previously entered an order barring Gina from calling any witnesses except herself and Dr. Finn. Steve asserts that the court erred in ruling that Gina could call Steve as a witness because he was a party to the case and not an adverse witness. Steve asserts that we should remand this matter to the circuit court and order the court to revise the Dissolution Judgment to the extent that it relies on Steve's testimony as an adverse witness. We review the trial court's admission of testimony for an abuse of discretion. *Garden View, LLC v. Fletcher*, 394 Ill. App. 3d 577, 588 (2009) (citing *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 294 (2002)).

¶ 58    Before we can address the merits of Steve's claim, we must first review the circumstances that gave rise to it. The case before us is actually the second dissolution proceeding between the parties. In 2016, Gina filed a dissolution proceeding against Steve in case 16 D 230507. However, Gina voluntarily non-suited that case before trial, and Steve instituted the present dissolution proceeding. During the pendency of the 2016 case, Steve filed a motion *in limine* to bar Gina from calling any witnesses at trial. In the motion, Steve asserted that on July 2, 2018, the circuit court set the case for trial starting on October 3, 2018. On July 28, 2018, Steve served Supreme Court Rule 213(f) interrogatories on Gina, but she had failed to answer. Steve asserted that the appropriate remedy for Gina's failure to answer the Rule 213(f) interrogatories was to bar Gina from calling any witnesses at trial, other than herself.

¶ 59    In February 2019, during the pendency of the 2018 dissolution action initiated by Steve, the circuit court entered an order finding that all of the orders entered in the 16 D 230507

proceeding regarding discovery "are in full force and effect in this case." In March 2019, the court granted Steven's motion *in limine* from the 16 D 230507 case. The court ruled that Gina was barred from calling any witness at trial, except that Gina could testify and that Dr. Finn could testify as the court's witness. The court also stated that the issue of "rebuttal witnesses" would be reserved "to the trial court as to any information that was not previously disclosed prior to trial." The court also barred Gina from introducing any evidence that she had not disclosed in discovery of the 16 D 230507 case.

¶ 60    At trial, Gina's attorney indicated his intention to call Steve as an adverse witness pursuant to section 2-1102 of the Code. 735 ILCS 5/2-1102 (West 2018). Steve filed a motion to enforce the March 2019 order which granted the motion *in limine* barring Gina from calling any witnesses. Steve argued that the March 2019 order permitted Gina to call only herself and Dr. Finn as witnesses. Following briefing and further oral argument by the parties, the court found that this was a unique situation because there was an order in place implementing a discovery sanction on Gina, preventing her from calling any witnesses at trial. The court noted that the witness Gina sought to call was Steve, who was a party to the case. The court stated that discovery sanctions can be entered to prevent surprise and prevent a party from being prejudiced as a result of an opposing party's failure to comply with discovery. The court found, however, that under section 2-1102, Steve was a party to the case, and there would be no surprise that he would be called. The court also found that Steve would suffer no prejudice as a result of being called as a witness. The court therefore overruled Steve's objection and permitted Gina to call Steve as an adverse witness.

¶ 61    Steve contends that the court's ruling was in error because even though he was a party to the case, he was still a witness, and Gina was barred from calling any witnesses pursuant to the motion *in limine*. However, the court did not allow Gina to call Steve under section 2-1102 because

he was not a witness. Rather, the court permitted Gina to call Steve as an adverse witness because, as a party to the case, he would not be surprised or prejudiced by being called as an adverse witness.

¶ 62    Indeed, even if we found that the trial court improperly allowed Gina to call Steve as an adverse witness, reversal would be warranted only if Steve suffered prejudice. *Garden View, LLC*, 394 Ill. App. 3d at 588 (citing *Arians v. Larkin Bank*, 253 Ill. App. 3d 1037, 1046 (1993)). In making that determination, we consider: "surprise to the adverse party; the prejudicial effect of the testimony; the nature of the testimony; the diligence of the adverse party; timeliness of the objection to the testimony; and the good faith of the party calling the witness." *Id.* at 588-89. Here, as the trial court found, as a party to the case, Steve could not be surprised that he was called as a witness by Gina to testify. Secondly, Steve has failed to demonstrate how the testimony Gina elicited was prejudicial. Steve's testimony as an adverse witness concerned much of the same information as his testimony in his own case-in-chief. In both circumstances, Steve discussed his employment history, the SF Trust, his involvement with the CBOE, and his ability to co-parent with Gina. "Hence, his testimony did not reflect subject areas that he was unfamiliar with or should not have already been prepared to testify about when called as a witness on his own behalf." *Id.* at 589. We acknowledge that Steve timely objected to the testimony, but we also observe that Gina appears to have acted in good faith in calling Steve as an adverse witness, believing that it was not barred under the discovery sanction order. In fact, during Gina's cross-examination of Steve during his case-in-chief, the court asked Gina's counsel if he was going to call Steve as an "1102 witness." Gina's counsel responded that he was, and Steve did not object at that time. Steve later objected, however, when the subject of calling Steve as an adverse witness was discussed again. Nonetheless, the totality of the circumstances in light of these factors does not warrant remanding

the matter for the court to disregard Steve's testimony as an adverse witness and revise its Dissolution Judgment.

¶ 63                                      E. Joint Decision-Making

¶ 64    Steve next contends that the court erred in allocating joint decision-making for S.F. in the Allocation Judgment. Steve asserts that both parties agreed that they could not make joint decisions and were unwilling to cooperate. Steve contends that we should remand this matter to the trial court to remove joint decision-making from the Allocation Judgment, but leave the 50/50 parenting time intact.

¶ 65    "The court shall allocate decision-making responsibilities according to the child's best interests." 750 ILCS 602.5 (West 2018). In reaching that decision, the court should consider:

"(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;

(2) the child's adjustment to his or her home, school, and community;

(3) the mental and physical health of all individuals involved;

(4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;

(5) the level of each parent's participation in past significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.5(c) (West 2018).

¶ 66     The circuit court is not required to make explicit findings on each factor, nor is it required to refer to every factor. *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991). We recognize that the trial court is in the best position to assess the credibility of the witnesses and determine the child's best interests. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 45. We will not disturb the circuit court's ruling on the allocation of decision-making responsibilities unless that decision is against the manifest weight of the evidence. *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64. "A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence." *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶ 51.

¶ 67    In the Allocation Judgment, the court found that it was in S.F.'s best interests "to have the maximum involvement and cooperation of each parent regarding her physical, mental, moral and emotional well-being." The court continued that it was therefore in S.F.'s best interests "that the parties consult with one another and attempt to jointly make all significant decisions on issues of long term-term importance" as that term is defined in the IMDMA. The court set forth a procedure for the parties to follow when a significant decision arises. The court stated that one party shall notify the other party of the issue and the other party shall inform the notifying party of their position on the issue. The court also provided a procedure for the parties to follow when they fail to agree on an issue of significant long-term importance, concerning the child's education, extracurricular activities, healthcare, and/or religious upbringing. The court also set forth default parameters for these issues, including that S.F. should attend school in the school district in which Steve resides, and each party is entitled to enroll S.F. in extracurricular activities that occur during their parenting time.

¶ 68    Steve contends that the court's allocation of decision-making responsibilities is in error because both parties agreed that that could not make joint decisions regarding S.F. Gina disagrees, asserting that the court did not err in allocating decision-making because the court provided for a procedure for the parties to follow in the event of a dispute. Steve responds that this position simply demonstrates Gina's "contrarian nature" to take a position opposite of Steve's even if doing so is adverse to her interests and beliefs. A review of the record, however, reveals that while both parties expressed doubt about the other party's ability to co-parent and share decision-making, both indicated that they could do so.

¶ 69    For instance, during his testimony, Steve testified that he believed Gina was a good parent, but that her natural parenting instinct had "short circuited." He testified that he could co-parent,

but Gina would not. When asked if he could make decisions with Gina for S.F., Steve responded: "Not at this time, no." Steve testified that he had the ability to communicate with Gina about decisions regarding S.F., and communicated with her "all the time." He testified, however, that they often disagree about S.F.'s health decisions. Gina also testified that she had trouble communicating with Steve regarding education and health decisions for S.F. She acknowledged, however, that in September 2019, the parties jointly made a decision regarding S.F.'s healthcare. Gina testified that Steve was "gracious," and informed her about the issue very quickly. The parties then went to the emergency room and spoke with doctors together to make sure that S.F. got the care that she needed.

¶ 70    The testimony thus shows that neither party expressly testified that the parties were unable to share decision-making responsibilities, but rather expressed doubts about the other parent's ability to share decision-making responsibilities. This demonstrates that both parents have a willingness to share decision-making responsibilities. Reviewing the factors of section 602.5(c), the parties appear to have the ability to cooperate to make decisions, despite some level of conflict for certain past decisions, the parties have each been involved in past significant decision-making, both parties wished to be involved in the decision-making process, the parties live near each other, and both parties indicated that they would facilitate and encourage a close relationship between the other parent and the child. The record thus shows that the parties can be cooperative and are able to reach shares decisions together in the best interest of S.F. See *In re Marriage of Perez*, 2015 IL App (3d) 140876, ¶ 33. Crucially, the circuit determined that it was in S.F.'s best interests that the parties share decision-making responsibilities. See *Young*, 2018 IL App (4th) 170001, ¶¶ 64-69. Accordingly, we cannot say that the trial court's allocation of decision-making responsibilities was against the manifest weight of the evidence.

¶ 71                                    F. Attorney Fees

¶ 72    Finally, Steve contends that the court erred in granting Gina attorney's fees based on a petition for a rule to show cause where the court denied the petition. Steve asserts that Gina is not entitled to fees under the IMDMA and did not make the required showing to support an award of fees.

¶ 73    In order to properly address Steve's contention, we must first set forth the factual record. On April 14, 2020, Gina filed an "Emergency Motion to Compel Petitioner to Comply with Parenting Schedule." In the motion, Gina asserted that Steve contacted her on March 24, 2020, during his parenting time with S.F. Steve told Gina that he would not turn S.F. over to Gina for her parenting time because he was concerned that he had been exposed to Covid-19. Gina maintained that as of the date filing the motion, 20 days had elapsed since Steve first refused to turn over S.F. Gina sought an order from the court compelling Steve to return S.F. to Gina immediately.

¶ 74    The court entered an order finding that a *prime facie* case of an emergency had been established and set the matter for a hearing. Steve also filed a response to Gina's emergency motion where he contended that her motion contained "gross misrepresentations[] and material omissions." Steve contended that he acted pursuant to the advice of S.F.'s pediatrician who told Steve to quarantine with S.F. for a period of 14 days. Steve asserted that this was confirmed by the court-appointed child representative who also spoke to S.F.'s pediatrician.

¶ 75    The court entered an order on Gina's motion "after conducting a telephonic hearing;" however, there is no transcript of this hearing contained in the record filed on appeal. Nonetheless, the court's findings of fact in the order indicate that Steve was supposed to return S.F. to Gina on March 25, 2020, for her parenting time. Steve did not return S.F. to Gina because he alleged that

he and S.F. were exhibiting symptoms consistent with Covid-19. Steve consulted with a pediatrician, which was confirmed by the child representative. However, neither Steve nor S.F. were tested for Covid-19 or diagnosed with Covid-19. Steve quarantined with S.F. for 14 days after March 25, 2020, but after the expiration of the 14-day quarantine, Steve did not return S.F. to Gina. Steve had not returned S.F. to Gina as of the date of the hearing on April 15, 2020.

¶ 76     Based on these factual findings, the court granted Gina's emergency motion. The court ordered that Steve was to return S.F. to Gina on April 20, 2020. Over Steve's objection, the court awarded Gina make-up parenting time equal to the amount of time Steve did not return S.F. past March 25, 2020. The court also granted Gina leave to file a petition for attorney fees related to the prosecution of the emergency motion, and granted her leave to file a motion for a rule to show cause against Steve based on the facts in the emergency motion.

¶ 77     Gina subsequently filed a petition for rule to show cause to issue for indirect civil contempt against Steve. The allegations in the rule to show cause largely mirrored those raised in the emergency motion. Gina alleged that she incurred attorney fees and costs in the amount of $2,156.25 based on the preparation and litigation of the petition, which Steve should be obligated to pay. Gina also filed a petition for attorney fees against Steve based on the emergency motion to compel pursuant to section 508(a) of the IMDMA. 750 ILCS 5/508(a) (West 2018). In the fee petition, Gina's counsel alleged that the aggregate fees incurred by Gina in relation to the prosecution of the emergency motion and the telephonic hearing were $3656.25. Gina's counsel alleged that the fees were reasonable and necessary, and attached to the petition a time sheet showing the services performed and the fees incurred.

¶ 78     Steve filed a motion to strike and dismiss Gina's petition for rule to show cause arguing that he returned S.F. to Gina on April 20, 2020, and was therefore now in compliance with the

parenting order. Steve also filed a response to Gina's petition for attorney fees. Steve contended that Gina's attorney had previously represented he was working *pro bono*, and therefore was not entitled to fees, had failed to attach a fee agreement to the petition detailing his hourly rate, and that the requested fees were excessive.

¶ 79    The court entered an order on both the petition for rule to show cause and the petition for attorney fees on February 10, 2021. The order indicated that a hearing was held on both petitions on February 3, 2021; however there is no transcript from such a hearing contained in the record filed on appeal. The court denied the petition for rule to show cause. However, the court awarded Gina attorney fees for the prosecution of the emergency motion to compel in the amount of $3,375 based on the fee petition. The order provides that the court granted the petition "based on the reasons stated on the record."

¶ 80    Steve contends that the court erred in granting Gina attorney fees for several reasons. First, Steve contends that Gina was not entitled to fees pursuant to section 508(a) of the IMDMA because the fees sought did not fall within that subsection. Section 508(a) of the IMDMA provides that: "The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees." Steve contends, citing *In re Marriage of Crecos*, 2021 IL 126192, that a party may be awarded fees under section 508(a) only in certain, limited circumstances. In *Crecos*, the supreme court stated that:

> "Section 508(a) thus contemplates three distinct types of fee proceedings: (1)
> interim attorney fees and costs in accordance with section 501(c-1) or section 508(a)(5)
> (id. §§ 501(c-1), 508(a)(5)), (2) contribution to attorney fees and costs in accordance with

section 503(j) or 508(a) (id. §§ 503(j), 508(a)), and (3) fees and costs to counsel from a former client in accordance with section 508(c) (id. § 508(c)).” *Id.* ¶ 13.

¶ 81    Steve maintains that Gina's petition for attorney fees did not fall within any of these three categories. He asserts that it was not an interim award of attorney fees because it was not temporary, it was not a contribution award because it was not awarded after a final judgment, and it was not an award from a former client. Steve also contends that the court erred in awarding fees to Gina because the court did not make a finding of Gina's inability to pay, which is a prerequisite for awarding fees to section 508(a).

¶ 82    We agree that section 508(a) was not the appropriate section for Gina to seek an award of fees in this case. We also agree with Steve that Gina "most likely" intended to seek attorney fees pursuant to section 508(b) of the IMDMA. Section 508(b) provides:

“In every proceeding for the enforcement of an order or judgment when the court finds that the failure to comply with the order or judgment was without compelling cause or justification, the court shall order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party.” 750 ILCS 5/508(b) (West 2018).

¶ 83    Steve asserts, however, that Gina was not entitled to attorney fees under that section because the court denied her petition for rule to show cause. Steve maintains that there was therefore no finding that he "did anything wrong." The court's award of fees, however, was not based on the petition for rule to show cause, but was rather based on the Gina's "Emergency Motion to Compel Petitioner to Comply with Parenting Schedule." In granting that motion, the court found that Steve failed to comply with the parenting order. Indeed, the court explicitly granted Gina leave to file a petition for attorney fees relating to the prosecution of the emergency

motion. The court granted the fee petition for reasons it stated on the record. As noted, however, there is no transcript from that hearing included in the record filed on appeal. There is also no report of proceedings from the hearing on the emergency motion itself. It was Steve's burden, as the appellant, to provide a sufficiently complete record of the trial proceedings to support a claim of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984). In the absence of a complete record on appeal, we presume that the order entered by the trial court was in conformity with the law and had a sufficient factual basis. *Id.* at 392. "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Id.* Because there is no transcript from the hearing on the emergency motion or on the petition for attorney fees, and the record shows that the court granted Gina's emergency motion finding that Steve failed to comply with the parenting schedule, there is no basis for us to find that the trial court erred in awarding attorney fees to Gina. See *id.*

¶ 84                                    III. CONCLUSION

¶ 85    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 86    Affirmed.