2024 IL App (2d) 220268-U
Nos. 2-22-0268 & 2-23-0141 cons.
Order filed March 12, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF TOBY DURCHSLAG, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 10-D-2480 |
| SCOTT DURCHSLAG, | ) ) ) | Honorable Michael G. Nerheim, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:  Trial court did not err in (1) denying respondent's motion to terminate or modify maintenance, or (2) finding respondent in indirect civil contempt and requiring him to pay petitioner's attorney fees arising from the contempt proceedings.

¶ 2   Following the entry of judgment in this marital dissolution case and an unsuccessful appeal of the trial court's award of maintenance, the respondent, Scott Durchslag, moved to terminate or modify that maintenance, arguing that there had been a change of circumstances since the initial award of maintenance.  He then stopped paying maintenance, and the petitioner, Toby Durchslag, filed a petition for a rule to show cause.  After a lengthy hearing, the trial court denied Scott's

motion to terminate or modify maintenance and found him in indirect civil contempt of court for ceasing his maintenance payments without leave of court. The trial court later ordered Scott to pay attorney fees incurred in connection with the contempt proceedings. Scott appeals all of these rulings. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      This marital dissolution case began in 2010. In 2013, the parties entered into a joint parenting agreement under which they shared custody of their two children: MD, born October 16, 2004, and LD, born November 14, 2007.[1]  In 2015, the trial court entered a judgment for dissolution of marriage that awarded Toby two-thirds of the $190,000 marital estate. The trial court also found that Toby should receive permanent (now termed "indefinite") maintenance, based on the following evidence and findings.

¶ 5      Prior to marriage, Toby had earned a significant annual income ($277,255) in the marketing field. However, she had gone completely deaf during the marriage and, at the time of trial, heard only with the aid of cochlear implants, which greatly limited her chances of future employment. Scott had held a succession of extremely highly-compensated jobs at the helm of various technology companies so that, despite periods of unemployment between each of those jobs, his

_____

[1]In September 2018, MD began living full-time with Scott. Based on this fact, Scott's August 2020 motion to terminate or modify maintenance also sought a reduction in his child support obligation. The trial court granted that portion of the motion, calculating Scott's new child support obligation, the amount of overpayment to be set off against his other obligations, and the new amount of child support once MD reached majority on October 16, 2022. The portion of the trial court's order addressing child support is not before us in this appeal.

average gross annual compensation from 2006 through 2013 was $1.7 million. The family enjoyed a luxurious standard of living that included a $2 million mansion in Lake Bluff overlooking Lake Michigan, frequent international travel involving first-class accommodations, dining out at fine restaurants, maintaining a wine collection valued in the hundreds of thousands of dollars, and private schools for the children. Although Scott was unemployed in 2015 when the dissolution judgment was entered, the trial court found that he remained capable of earning his previous average income of $1.7 million. However, it reserved its ruling on the appropriate amount of maintenance until such time as he found employment.

¶ 6    Shortly after the entry of the dissolution judgment, Scott was hired as the CEO of Angie's List with an annual compensation package of $5.2 to $5.9 million, well above his previous $1.7 million average annual compensation. Scott was hired to "turn around" the company, which he did, locating a buyer for it. By December 2017, Scott was once again unemployed, albeit with a "golden parachute" compensation and severance package of cash and stock options valued at $18 million. After a hearing, the trial court set Scott's maintenance obligation at $42,645.92 per month, a figure that represented 30% of his prior average gross annual income of $1.7 million.

¶ 7    Scott filed an appeal challenging, among other things, his maintenance obligation. We affirmed, holding that there was nothing inappropriate about the trial court's use of income averaging as a basis for its maintenance calculations, given Scott's periodic unemployment and his established earning capacity. *In re Marriage of Durchslag*, 2019 IL App (2d) 180003-U, ¶ 31. Moreover, Scott himself had proposed that Toby receive 30% of his gross annual income, although he incorrectly calculated the amount of that income. *Id.* ¶ 32. Scott filed a petition for leave to appeal to the supreme court that was denied.

¶ 8    In August 2020, Scott filed a motion to terminate or reduce his maintenance obligation. He argued that he had experienced a substantial change in circumstances because he had remained unemployed since leaving Angie's List and had largely run through his assets. The trial court ordered discovery and briefing. In December 2020, Scott moved to abate his maintenance obligation immediately, alleging that he was on the "verge of bankruptcy." He then stopped paying any maintenance to Toby and did not resume those payments even after the trial court denied his motion to abate. In January 2021, Toby filed a petition for a rule to show cause why Scott should not be held in contempt for failing to pay maintenance.

¶ 9    The hearing on Scott's motion to terminate or reduce maintenance and Toby's petition for a rule to show cause began on June 1, 2021, and continued for five more days over the course of the next several months. The evidence presented included financial statements, bank statements, credit card bills, certain tax returns, and testimony primarily by the parties. Scott's tax documents showed that his gross income from 2015 through 2019 was as follows: $668,183 in 2015; $5,308,981 in 2016; $18,313,817 in 2017; $2816 in 2018; and $107,574 in 2019. (Although Scott filed a tax return in 2020, he did not produce it.) Thus, so far as can be determined from his tax records, Scott received a gross income of over $24 million between 2015 and 2019, almost all of that accruing in 2016 and 2017. Scott testified that the compensation and severance package from Angie's List was primarily in the form of stock in that company, and that although it was valued at about $18 million when he received it, he did not sell it all in 2017 but instead sold some of it off over time, occasionally at a "loss" (compared to its value on the date he received it). Further, he had to pay substantial tax on that package. Scott testified that he received about $2 million in cash and that his sales of Angie's List stock had netted him $7.6 million over three years. Scott produced limited documentary evidence of these stock sales.

¶ 10    Scott's expenditures during years immediately before and after he filed his motion were difficult to pin down, but they were clearly substantial.    Many of those expenditures were connected to his decision to acquire several (eventually as many as ten) high-end dressage and sport horses.    Scott testified that he began buying horses in 2018, initially to support his daughter's equestrian dreams, but he eventually decided to pursue a business venture in breeding, training, showing, and selling high-end horses.    According to his 2019 tax return, he spent over $900,000 that year (about $75,000 per month) in buying, feeding, boarding, training, and insuring his horses. At trial, he testified that the monthly expenses for his horses came to a minimum of $34,600 per month.    According to his 2020 financial affidavit, his own living expenses (which included approximately $1000 in charitable donations), came to an additional $36,812 per month.    He charged over $2 million on credit cards in 2020, and $370,000 during the first four months of 2021. Scott later testified that he had spent a total of $3 million to acquire and care for his horses.

¶ 11    Scott testified about his efforts to find work comparable to that he had held in the past. Scott's assets at the end of 2020, when he stopped paying maintenance, included over $442,000 in bank accounts.    In 2021, Scott used over $300,000 in funds from these accounts to pay his own and the children's living expenses and the expenses for his horses.    Between June 2020 and 2022, he sold two horses for a total of $170,000, and in mid-2021, he withdrew about $100,000 from his retirement accounts. He used all of this money for his and his children's living expenses and horse-related expenses, stating that he could not use any of it to pay his maintenance obligation because there was "no way I could meet the maintenance obligation and meet my duty to pay the children's expenses and to be able to take care of the horse business.    There is a fundamental tradeoff." Although Scott acknowledged the trial court's maintenance order, he testified that he did not view it as a "legal obligation" like his duty under anti-cruelty statutes to care for his horses.

¶ 12   In June 2022, the trial court issued a detailed 13-page memorandum opinion and order. After a detailed recitation of the evidence presented and consideration of each of the factors identified in section 510(a-5) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/510(a-5) (West 2020)), the trial court found that Scott had not shown that the requisite substantial change in circumstances had occurred.  The trial court acknowledged that Scott had made efforts to find work commensurate with his previous experience.  However, his continued unemployment did not represent a change in circumstances since the prior operative court orders. Scott was unemployed in 2015, when the trial court determined that (a) Toby should receive indefinite maintenance, (b) Scott's average gross income from 2006 through 2013 was $1.7 million annually, and (c) he was capable of earning that much in the future.  Scott was unemployed again in 2017 when the trial court set the amount of his maintenance, basing it on the previously-determined average annual income of $1.7 million.  Thus, his continued unemployment in 2020 did not represent a change in circumstances and was consistent with his history of periods of unemployment.  Nor was there any indication that Scott's average gross income had decreased in the time since it was first calculated as, taking his 2017 severance package into account, it was actually higher now than the $1.7 million per year previously used as a basis for calculating his maintenance.  Further, Scott "presented no credible evidence" that Toby's disability had lessened and had not shown that Toby's needs in order to maintain the standard of living enjoyed during the marriage had changed.

¶ 13   The trial court also rejected Scott's arguments that his assets had been depleted to the point that he was simply unable to pay his maintenance obligation.  It found that Scott had presented evidence that he had devoted at least $3 million (by Scott's estimate) to this business, stating:

"There was considerable testimony from Scott regarding his responsibilities as it relates to United States Sport Horses, and the significant expenses of approximately $36,000.00 per month to board, feed, groom, insure and exercise his horses. Scott testified that he started this business in order to help enable his daughter's dreams to be a professional rider, trainer and to compete at 'the highest levels of the sport.' When asked about his business plan for United States Sport Horses, Scott testified 'Basically to have three years of losses—and nobody makes money in the first three years of a horse business, or most businesses for that matter, but particularly a horse business—[followed by] three years of break even, and then turning to a financial objective, a positive net cash flow that would generate up to a hundred thousand dollars a year, which would enable my daughter (MD) to be able to support herself as a professional in the year she is graduating from college.' "

The trial court found that devoting this much money (as well as a significant amount of time, which the trial court found affected Scott's ability to seek employment) to a business venture that Scott believed would not turn a profit until its seventh year "was a reckless use of resources for someone that is unemployed with a $42,645.92 per month maintenance" obligation. These expenditures amounted to "a voluntary loss undertaken by Scott which impact[ed] his ability to meet his obligation to Toby," and this voluntary loss did not support a finding of a substantial change in circumstances. The trial court cited *In re Marriage of Virdi*, 2014 IL App (3d) 130561, ¶¶ 3, 16, and *In re Marriage of Deike*, 381 Ill. App. 3d 620, 632 (2008), for the proposition that a party cannot use voluntary changes in his own circumstances as a basis to modify support obligations. Finding that Scott had not proven the requisite substantial change in circumstances, the trial court denied his request to terminate or modify his maintenance obligation.

¶ 14    The trial court then addressed Toby's petition for a rule to show cause. Scott acknowledged that he violated the order that he pay maintenance but argued that his conduct was not willful because he was unable to pay maintenance due to his obligation to care for the horses he had accumulated in connection with his business. The trial court rejected this argument, finding the horses' needs to be a voluntary obligation taken on in derogation of his support obligation to Toby. The trial court found that the amount of past-due maintenance Scott owed was $724,980.64, less credit for his overpayment of child support, and that statutory interest was due on that amount. It also found, pursuant to Illinois Supreme Court Rule 304(a), that there was no just reason to delay the enforcement or appeal of its judgment. Scott filed an appeal, docketed in this court as No. 2-22-0268.

¶ 15    Toby petitioned pursuant to section 508(b) of the Act (750 ILCS 5/508(b) (West 2020)) for her attorney fees arising from the contempt proceedings. Her attorney submitted an affidavit listing $377,900 in such fees. Scott contested the fee petition, identifying matters billed that he contended were unrelated to the contempt proceedings. In April 2023, the trial court issued a memorandum order and opinion agreeing that there were some unrelated items in the billing. The trial court found that $153,313.74 of the fees were either unreasonable or unrelated to the contempt proceedings, and ordered Scott to pay the remaining $224,586.26 to Toby's attorney. Scott filed an appeal of this order as well, which was docketed as No. 2-23-0141. The two appeals were consolidated for briefing and decision.

¶ 16                                II. ANALYSIS

¶ 17    On appeal, Scott argues that the trial court erred both in denying his motion to terminate or modify maintenance and in finding him in indirect civil contempt of court. He also argues that, if we vacate the finding of contempt, we should vacate the award of attorney fees.

¶ 18                         A. Motion to Terminate or Modify Maintenance

¶ 19    Challenging the trial court's order denying his motion to terminate or modify his maintenance obligation, Scott contends that he met the requirements for modification in that (1) he showed a substantial change in circumstances since the entry of the previous maintenance order in December 2017, and (2) the statutory factors weighed in favor of granting the modification.  As we determine that the trial court did not err in finding that Scott had not met the first requirement to show a substantial change in circumstances, we do not reach his second contention.

¶ 20    Under section 510(a-5) of the Act, a maintenance order may be modified only upon a showing of a substantial change of circumstances.  *Id*. § 5/510(a-5).  "A 'substantial change in circumstances' for purposes of section 510(a-5) means that there has been a change to either the needs of the spouse receiving maintenance or the ability of the other spouse to pay that maintenance."  *In re Marriage of Carstens*, 2018 IL App (2d) 170183, ¶ 30.  The party seeking a modification of maintenance bears the burden of establishing a substantial change in circumstances.  *In re Marriage of Bernay*, 2017 IL App (2d) 160583, ¶ 14.

¶ 21    In a bench trial or a hearing such as the lengthy multi-day proceedings on Scott's motion, the trial court sits as the trier of fact, hearing the witnesses and reviewing the direct presentation of the evidence, and it is in the best position to make credibility determinations and factual findings.  *In re Marriage of Matchen*, 372 Ill. App. 3d 937, 946 (2007).  We therefore will not reverse the judgment in a bench trial unless it is against the manifest weight of the evidence; that is, unless "the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence."  *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 544 (2007).  We review the trial court's ultimate decision to deny the motion for an abuse of discretion (*In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶ 20) and will not

reverse unless the ruling was arbitrary, fanciful, or unreasonable, or no reasonable person would take the view adopted by the trial court, or if its ruling rests on an error of law (*People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11).

¶ 22 Scott first argues that the previous maintenance judgment entered in December 2017 was based on facts that are no longer true, *i.e.*, that he was employed, and that his average gross compensation was $1.7 million per year. The record refutes this argument, however. When the December 2017 maintenance award was entered, Scott had completed his employment with Angie's List and was no longer employed. Thus, he had no current income at all. The same was true in 2020, when he moved to modify his maintenance obligation, as well in 2022, when the trial court denied that motion. The record is clear that Scott was unemployed and covering his living expenses by relying on prior income, not current income, both in December 2017 and when he sought to modify his maintenance obligation. Thus, the trial court correctly found that this circumstance had not changed.

¶ 23 When it entered its December 2017 order setting maintenance, the trial court recognized that Scott's maintenance calculation would be skewed if it were based on his uniquely high 2016 and 2017 compensation of almost $24 million, and it instead adopted Scott's previous average annual income of $1.7 million (which was calculated in 2015) as the basis for its computations. Scott thus received the benefit of income averaging that did not take into account his unusually high compensation in 2016 and 2017.

¶ 24 Scott now complains that the 2015 determination that his average annual compensation was $1.7 million is outdated, and that the trial court should have considered only his most recent income, which he contends is $0. This argument overlooks the fact that, as the trial court here noted, Scott's total compensation in the years since his average compensation for maintenance

- 10 -

purposes was last computed was over $24 million, and that his average gross annual income is now actually *higher* than $1.7 million.

¶ 25    Scott attempts to support his argument that his income in the last several years was really $0 by arguing that the trial court's decision in December 2017—to rely on the 2015 determination of Scott's average annual compensation rather than his unusually high income in 2016 and 2017—amounted to a ruling that the almost $24 million he earned in those years could *never* be considered in setting maintenance, under the principles of *res judicata*.  This argument is simply incorrect.

¶ 26    To begin with, the December 2017 judgment does not state that Scott's 2016 and 2017 income should never be considered in determining the appropriate amount of maintenance.  Nor has Scott identified any other order making such a ruling.  Thus, Scott has not shown the first requirement for *res judicata*—the existence of a final judgment on the merits of an issue by a court of competent jurisdiction.  *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 44.  Moreover, section 510(a-5) of the Act directs that decisions about the modification of maintenance must be based on factors including "the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought."  750 ILCS 5/510(a-5)(7) (West 2020).  Here, although the previous maintenance judgment was entered in December 2017, it relied on an income determination from 2015.  As Scott concedes, "the Angie's parachute [severance package] was not used to compute the monthly maintenance in December 2017."  (Again, we must point out that this course of action was greatly to Scott's benefit.)  Thus, under the statute, the relevant period for calculating Scott's income was 2016 through the filing of his motion to modify.  In the absence of any *res judicata* bar, the trial court correctly considered the compensation Scott received since maintenance was last set as a factor in its determination of whether he had shown a substantial chance in circumstances.  See 750 ILCS 5/510(a-5)(7) (West 2020).

¶ 27    Scott also argues that he has depleted his assets and that this too establishes a substantial change in circumstances. The trial court rejected this argument, finding that the $3 million that Scott had spent on his horses amounted to a voluntary loss. The trial court noted that such losses cannot be the basis for finding a substantial change in circumstances, citing *Virdi*, 2014 IL App (3d) 130561, ¶¶ 3, 16, and *Deike*, 381 Ill. App. 3d at 632. Scott attempts to distinguish his situation from that in *Deike* on the basis that, unlike the obligor there, Scott "never intended" his horse venture "to be the sole source" used to pay his expenses or maintenance obligation and always intended that any profits that the business generated should be used simply to pay for his daughter's horse showings. We cannot see what difference this makes, given *Deike*'s holding that losses which an obligor incurs by choice should not be considered in determining whether there has been a substantial change in circumstances. See *Deike*, 381 Ill. App. 3d at 632. We also note that Scott is unable to distinguish *Virdi* or any of the many other cases cited by Toby for the proposition that a substantial change in circumstances cannot be found where it is the result of the deliberate decisions of the party seeking to reduce its support obligation. Scott knew that his living expenses and his maintenance obligation totaled almost $80,000 per month (almost $1 million per year), yet he chose to ignore those obligations to pursue a venture that, by his own testimony, consumed substantial assets and was expected to generate only $100,000 by its seventh year of operation.

¶ 28    Scott declares that he "was entitled to try to start a side business *** to foster his daughter's equestrian ambitions." While that is true, Scott was not entitled to have the court treat his decision to spend over $3 million on that business without the expectation of any real financial return as the basis for finding a substantial change in circumstances. The trial court's finding that Scott had not shown a substantial change in circumstances is not against the manifest weight of the evidence. That being so, the trial court properly denied his motion to terminate or modify his maintenance

obligation. See 750 ILCS 5/510(a-5) (West 2020); *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 203 (2011).

¶ 29                            B. Finding of Indirect Civil Contempt

¶ 30    Scott next challenges the trial court's finding him in indirect civil contempt for disregarding the trial court's order to pay Toby maintenance.[2] The trial court found that Scott had disobeyed this order beginning in January 2021, and that his conduct was willful and lacked justification. Scott had argued that his nonpayment was not willful because he lacked funds to pay Toby's maintenance because he was statutorily obligated by anti-cruelty statutes to pay for his horses' care, and he could not afford to do both. The trial court rejected this argument, finding that Scott's financial straits were self-created and that Scott knew that his horse business would consume far more resources than it would generate. Scott argues that this finding was error.

---

[2]Technically, Scott could not directly appeal the trial court's June 2022 finding of contempt itself, because that finding did not include the imposition of any penalty designed to obtain Scott's future compliance. A bare finding of contempt, without a penalty, is not appealable. *In re Marriage of Gutman*, 232 Ill. 2d 145, 152 (2008) (only contempt judgments that impose sanctions are appealable). However, Scott appeals the trial court's April 2023 award of attorney fees to Toby under section 508(b) of the Act. 750 ILCS 5/508(b) (West 2020). In reviewing the order awarding fees, we may also review the propriety of the underlying finding of contempt. See *Schmidt v. Joseph*, 315 Ill. App. 3d 77, 80 (2000) (reviewing court may review orders that are a step in the procedural progression to the order appealed from). We address Scott's challenges to the contempt finding (the predicate to the award of section 508(b) fees) before addressing his challenges to the order imposing those fees.

¶ 31    Civil contempt occurs when a party willfully fails to comply with a court order. *In re Marriage of Knoll & Coyne*, 2016 IL App (1st) 152494, ¶ 50. "The burden initially falls on the petitioner [seeking the rule to show cause] to establish, by a preponderance of the evidence, that the alleged contemnor has violated a court order. [Citation.] Once that burden is satisfied, the burden shifts to the contemnor, who has the burden of showing that the violation was not willful and contumacious and that he or she had a valid excuse for failing to follow the order." *Id.* "Whether a party is guilty of contempt is a question of fact for the trial court, and a reviewing court should not disturb the trial court's determination unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion." *In re Marriage of McCormick*, 2013 IL App (2d) 120100, ¶ 17.

¶ 32    On appeal, Scott raises several arguments for why his conduct was not contumacious. He notes that he began his horse business in 2018 and should not be penalized for that decision, as he could not foresee that he would still be unemployed three years later. Further, when he was faced with a decision about whether to discontinue Toby's maintenance payments or caring for his horses, he reasonably acted to avoid the criminal liability that could arise under anti-cruelty statutes if he neglected his horses. These arguments lack merit. Although the trial court was critical of Scott's decision to spend $3 million on starting a horse business when he knew that he had a legal obligation to Toby of over $500,000 per year, that is not why the trial court found Scott in contempt. Rather, the trial court's finding of contempt was based on Scott's failure to comply with his court-ordered maintenance obligation without justification. As the trial court noted (quoting *In re Marriage of Logston*, 103 Ill. 2d 266, 286 (1984), which quoted *Shaffner v. Shaffner*, 212 Ill. 492, 496 (1904)), "A party seeking to avoid a contempt finding may pay his 'bare living expenses' and 'mere necessities of life' but he must apply any remaining funds towards his support

obligations." Scott's extremely expensive horse business was not a "bare living expense" or a necessity of life. As the trial court further noted (quoting *In re Marriage of Kneitz*, 341 Ill. App. 3d 299, 303 (2003)), a "contemnor may not assert her inability to comply where she has voluntarily created the incapacity." Scott asserts that his "economic circumstances were not self-imposed," citing *In re Marriage of McGuire*, 305 Ill. App. 3d 474, 482 (1999), but the circumstances in that case were quite different: the obligor there spent only on his living expenses and, unlike in this case, there was "no evidence that petitioner was living an extravagant lifestyle or willfully incurring additional debt." *Id*. Further, Scott's references to criminal liability provisions of the anti-cruelty statutes are disingenuous: he could easily have chosen to fulfill his duty of care toward his horses as well as his obligations to Toby by simply selling the horses. The trial court did not err in finding Scott's disregard for his court-ordered maintenance obligation willful and without justification.[3]

¶ 33    Lastly, Scott argues that the trial court should not have awarded Toby attorney fees (albeit less than she sought) arising from the contempt proceedings under section 508(b) of the Act (750

---

[3]Scott also argues summarily that the trial court's failure to set a "purge" in its June 2022 order finding him in contempt rendered that contempt finding "void." Toby responds that a contempt order need not contain a purge unless it imposes coercive measures such as a fine or incarceration, and the trial court's June 2022 order did not do that. We agree with this logic. We also note that, although the trial court ultimately did sanction Scott for his contempt by awarding section 508(b) fees (see *In re Marriage of Putzler*, 2013 IL App (2d) 120551, ¶ 40 (section 508(b) fee awards are in the nature of sanctions, as they exist in part to "sanction[ ] unjustified violations of court orders")), those sanctions were not in themselves coercive and thus did not require a purge.

ILCS 5/508(b) (West 2020)), because his failure to pay maintenance as ordered was justified. Section 508(b) requires the award of attorney fees in certain circumstances, including enforcement proceedings where the failure to comply was unjustified: "In every proceeding for the enforcement of an order or judgment when the court finds that the failure to comply with the order or judgment was without compelling cause or justification, the court shall order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party." *Id.* As we have affirmed the trial court's determination that Scott's noncompliance with the maintenance order lacked justification, we likewise affirm the trial court's grant of attorney fees under section 508(b). " '[F]inding a party in contempt for failing to comply with a court order implies a finding [that] the failure to comply was without cause or justification,' rendering mandatory the imposition of attorney fees per section 508(b)." *In re Marriage of Putzler*, 2013 IL App (2d) 120551, ¶ 38 (quoting *Deike*, 381 Ill. App. 3d at 634).

¶ 34                                    III. CONCLUSION

¶ 35    For the reasons stated, the judgment of the circuit court of Lake County is affirmed.

¶ 36    Affirmed.